Filed 05/01/2017

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ALISA CROSS, | B277600 |
| Petitioner, | (Super. Ct. No. BS160696) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| AWET KIDANE, DIRECTOR, DEPARTMENT OF CONSUMER AFFAIRS, et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS in mandate.  Robert Hess, Judge.  Petition granted in part and denied in part.

Baranov & Wittenberg, Gary Wittenberg, for Petitioner.

No appearance for Respondent.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gloria L. Castro, Senior Assistant Attorney General, Judith T. Alvarado, Supervising Deputy Attorney General, Christine R. Friar, Deputy Attorney General, for Real Parties in Interest.

Alisa Cross (petitioner) is a physician, one who specializes exclusively in psychiatry. The California Department of Consumer Affairs (Department), the governmental agency that houses the Medical Board of California (Board), served petitioner with subpoenas to further its investigation into whether she improperly prescribed controlled substances to three people who are ostensibly her patients. Petitioner refused to produce the subpoenaed medical records, citing the psychotherapist-patient privilege and the patients' constitutional right to privacy. The Department then filed a petition to compel compliance with the subpoenas, which the trial court granted—reasoning that a provision of the Medical Practice Act precluded petitioner from relying on the psychotherapist-patient privilege in a Board investigation, and that there was good cause to require production of the records notwithstanding the patients' privacy rights. These two issues—the applicability of the psychotherapist-patient privilege in a Board investigation into improper prescribing of controlled substances, and the sufficiency of the Department's showing to overcome the patients' right to privacy—are the same issues before us in this proceeding.

I

A

The Board is a creature of statute. (Bus. & Prof. Code, § 2001.) It is a 15-member body located within the Department and it is charged with protecting the public through, among other things, issuing medical licenses and certificates, reviewing the quality of medical practice carried out by licensed physicians, and enforcing the disciplinary and criminal provisions of the Medical Practice Act, i.e., Business & Professions Code section 2000 et

2

seq. (Bus. & Prof. Code, §§ 2001.1, 2004, 2220.) The practice of medicine without a valid certificate issued by the Board (or a certificate issued in accordance with some other provision of law) is a criminal offense. (Bus. & Prof. Code, §§ 2051, 2052.) By virtue of the Medical Practice Act and other laws (and with certain exceptions not relevant here), only physicians may prescribe drugs to patients; psychologists and other mental health professionals may not. (Bus. & Prof. Code, §§ 2051, 2052, 2904; Health & Saf. Code, § 11150.)

The Director of the Department is authorized to investigate all matters under the Department's jurisdiction, and to issue subpoenas in furtherance of such investigations. (Gov. Code, §§ 11180, 11181, subd. (e); *Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 8.) Disciplinary investigations under the Medical Practice Act are conducted jointly by Board personnel, Department investigators (pursuant to authority delegated from the Department's Director), and the Health Quality Enforcement Section of the Attorney General's office.[1] (Bus. & Prof. Code, §§ 2006, 2220; Gov. Code, §§ 12529.6, 11182.) Unprofessional conduct by a physician that is subject to investigation includes the violation of any provision of the Medical Practice Act, gross negligence, "[r]epeated acts of clearly excessive prescribing . . . of drugs," and "[p]rescribing, dispensing, or furnishing dangerous drugs as defined in Section 4022 without an appropriate prior examination and a medical indication . . . ." (Bus. & Prof. Code, §§ 725, 2234, 2242; see also Bus. & Prof. Code, §§ 2220.05, subd.

---

[1]     The Board is the only licensing board authorized to investigate or commence disciplinary actions against physicians licensed to practice in this State. (Bus. & Prof. Code, § 2220.5.)

3

(a) [prioritizing the investigation of ["[r]epeated acts of clearly excessive prescribing, furnishing, or administering of controlled substances, or repeated acts of prescribing, dispensing, or furnishing of controlled substances without a good faith prior examination of the patient and medical reason therefor"], 4022 ["dangerous drugs" are those requiring a prescription].)

B

In May 2014, the Board received a "consumer complaint" alleging petitioner, a Board licensed physician since 1995, was overprescribing psychotropic medication.[2]  Staff in the Board's consumer complaint unit obtained a Controlled Substance Utilization Review and Evaluation System (CURES) report that listed the Schedule II-IV controlled substance prescriptions written by petitioner over the prior three years, as well as the patients for whom the prescriptions were written.[3]  A consultant working with the Board's complaint unit recommended further

---

[2]   The Board treats such complaints as confidential unless and until it decides to institute formal disciplinary proceedings against a physician.  No further information about the complaint is included in the record, nor was any such information produced to petitioner.

[3]   California divides controlled substances into one of five schedules, which are intended to group the drugs according to their potential for abuse and the degree to which they have an accepted medical use.  (Health & Saf. Code, §§ 11054-11058; see generally 2 Witkin & Epstein, California Criminal Law (4th ed. 2012) Crimes Against Public Peace and Welfare, § 85, pp. 728-729.)

4

investigation, and the matter was referred to Department investigator Ellen Coleman.

Investigator Coleman asked Dr. Cheryl Gray to review the CURES report in an effort to identify people for whom petitioner may have been over-prescribing controlled substances. Dr. Gray is a licensed physician who is board certified in internal medicine and employed by the Department as a medical consultant. Because one of her duties is to review questionable medical and surgical practices by physicians licensed by the Board, she is responsible for maintaining familiarity with the standard of medical practice in California.

Dr. Gray identified three individuals listed in the CURES report as people to whom petitioner may have prescribed controlled substances in a manner that appeared to be inconsistent with the standard of care: M.L., L.R., and J.M.B. All three patients were prescribed central nervous system stimulants, which are Schedule II controlled substances—drugs that have a high potential for abuse that may lead to severe psychological or physical dependence.

Patient M.L., an adult female, received 120 tablets of 20 mg Adderall each month from June 22, 2013, to June 11, 2014. Adderall, an amphetamine salt combination drug, is predominantly used to treat Attention-Deficit Hyperactivity Disorder (ADHD) and narcolepsy. In Dr. Gray's opinion, the dispensation reflected in the CURES report appeared to suggest M.L. took four Adderall tablets per day, which would mean a daily dose of 80 mg of the drug. Dr. Gray consulted multiple prescription drug reference sources, including the Physician's Desk Reference, that indicated this 80 mg amount exceeded the maximum daily recommended dosage for treatment of ADHD,

5

which "would rarely require more than 40 mg per day," and narcolepsy, which had a total daily recommended dosage of 60 mg.

Petitioner prescribed patient L.R., also an adult female, 120 tablets of 30 mg Adderall each month from March 1, 2012, to July 27, 2012. Dr. Gray believed this appeared to indicate L.R. took four tablets per day, or a total of 120 mg daily. Dr. Gray opined this daily dosage level was three times the total recommended daily dosage of Adderall for treatment of ADHD and in excess of the recommended maximum daily dosage for treatment of narcolepsy.

J.M.B., the third patient identified by Dr. Gray from the CURES report, received 60 tablets of 20 mg Adderall each month from April 1, 2013, to June 27, 2013. Dr. Gray believed this appeared to indicate J.M.B., also an adult female, took two tablets a day, which equaled the maximum recommended daily dosage for treating ADHD (and was less than the maximum recommended daily dosage for narcolepsy). However, the CURES report also indicated petitioner prescribed 30 capsules of 40 mg Vyvanse for J.M.B. during the same time period. Vyvanse is also a central nervous system stimulant, one that is considered "longer acting." Dr. Gray believed the Vyvanse prescription data indicated J.M.B. took 40 mg of the drug on a daily basis, in addition to the Adderall tablets. It was unclear to Dr. Gray why Vyvanse had been prescribed because it was not indicated for use in treating narcolepsy.

Investigator Coleman mailed forms to each of the three patients that, if signed, would authorize the Board to obtain their medical and psychiatric records from petitioner for use in the Board's investigation. The correspondence from Investigator

6

Coleman further notified the patients that if the Board did not receive executed releases for the medical records, the Board would subpoena the records. Investigator Coleman received no response from L.R. and J.M.B. Investigator Coleman also received no returned authorization from M.L., but Investigator Coleman did reach her by phone. According to Investigator Coleman, M.L. said she had never been treated by petitioner.

The Department thereafter issued three subpoenas for the medical records of M.L., L.R., and J.M.B. The subpoenas demanded records pertaining to the identical time periods Dr. Gray identified in the CURES report as being of interest, i.e., for approximately one year for M.L.; for almost five months for L.R.; and for almost three months for J.M.B. The subpoenas were drafted to require production of "the complete medical record" for the patients during these time periods. According to the terms of the subpoenas, the "complete medical record includes, but is not limited to: [¶] 1. all medical and psychiatric histories, diagnoses, treatment notes and records, physical examinations, test results, orders, prescription records, operative reports, consultation records, nursing notes; [¶] 2. all x-ray films and reports, MRIs and reports, CT scans and reports; [¶] 3. all pathology reports and laboratory data; [¶] 4. all correspondence, doctor-patient agreements, memorandums, releases, telephone messages; [¶] 5. all billing records; and [¶] 6. all other data, information or record which would reveal all medical care provided to the patient."

Investigator Coleman served the subpoenas on petitioner,[4] and petitioner, through counsel, declined to produce any of the

---

[4] Investigator Coleman also mailed copies of the subpoenas to the three patients, advising each of their right to object. None

subpoenaed records.  Petitioner informed Investigator Coleman she had contacted both M.L. and J.M.B., both of whom told petitioner they did not consent to their records being released to the Board.  Without either M.L. or J.M.B.'s consent, and having been unable to reach L.R., petitioner took the position she was unable to release the subpoenaed records in light of the physician-patient and psychotherapist-patient privileges.

C

The Department filed a petition in the superior court to compel petitioner's compliance with the investigative subpoenas. The petition averred the medical records of the three patients were "essential" to the Board's ability to properly assess whether petitioner's treatment of the patients accorded with medical standards of care, and that without the subpoenaed records the Board "cannot fulfill its monitoring responsibilities of public protection, as mandated by California law."  The Department's petition was supported by declarations from Investigator Coleman and Dr. Gray.

Dr. Gray opined the prescription patterns for M.L., L.R., and J.M.B., "in the absence of any other information, appear to represent concerning departures from the standard of care" for prescribing the central nervous system stimulants at issue, which have "a high potential for abuse."  Dr. Gray noted that the stimulants prescribed had been associated with adverse health effects, including "sudden death, stroke and myocardial infarction in adults."  Dr. Gray's opinion that petitioner may have violated

of the patients contacted Investigator Coleman or appeared in the court proceedings that ensued to enforce the subpoenas.

8

the Medical Practice Act was also influenced by her review of records indicating petitioner had been the subject of a prior disciplinary proceeding in Texas.[5]

In Dr. Gray's opinion, any circumstances or conditions that would require dosages or quantities of the prescribed stimulants outside the customary range should be documented by the prescribing physician.  Dr. Gray also explained other steps a physician must take, consistent with the standard of care, when prescribing the medications:  "Prior to prescribing [these drugs] to an adult, a targeted cardiac history looking for previously diagnosed cardiac disease, any history of palpitations, syncope (fainting), or any other serious cardiac structural or rhythm disorder, must be done.  The prescriber must also determine if the patient has a history of glaucoma, hyperthyroidism or moderate to severe hypertension as these conditions are contraindications for the use of [central nervous system] stimulant medications.  [¶]  Once the [central nervous system] stimulant medication is prescribed, the clinician must regularly

---

[5]     Petitioner is licensed to practice medicine in Texas as well as California.  In a disciplinary order issued on June 12, 2015, the Texas Medical Board publicly reprimanded petitioner based on her admission that, during the period from 2009 to 2014, she had prescribed controlled substances to a person with whom she has a close, personal relationship.  "Specifically, [petitioner] admitted to prescribing a 30-day supply of Ambien, with refills, as well as other medications to this person, who is a resident of Oregon."  In addition to the public reprimand, petitioner was ordered not to treat, or prescribe medication to, her immediate family; to take and pass a medical jurisprudence examination; to complete various medical education courses; and to pay a $3,000 penalty.

assess the patient's blood pressure and pulse[,] since this class of drug is known to increase both, and monitor for signs/symptoms of peripheral vasculopathy."

Dr. Gray believed the three patients in question, all women who were likely postmenopausal, may be at increased risk for coronary artery disease complications, which could be exacerbated by use of the prescribed stimulants. According to Dr. Gray, a review of the patients' medical records "is necessary to confirm that an appropriate examination/screening was done before prescribing this medication regimen and also to determine whether regular assessments of the efficacy and effects of the treatment regimen were not only conducted but documented and that the appropriate monitoring measures were performed."

Petitioner opposed the Department's request for an order to compel compliance with the subpoenas. The thrust of the opposition was two-fold: first, that the subpoenaed records were protected by the psychotherapist-patient privilege, and second, even if the privilege did not apply, the Department had shown no good cause that would overcome the patients' constitutional right to privacy in their medical records.

With her opposition, petitioner submitted her own declaration. She stated she contacted M.L. and J.M.B., both of whom instructed her not to disclose their records to the Board and to assert the psychotherapist-patient privilege on their behalf; petitioner had been unable to reach L.R. but believed she had an ethical and legal obligation to assert the privilege on her behalf as well.

Petitioner's declaration also sought to undermine the factual showing made by Dr. Gray in support of the petition to enforce the administrative subpoenas. Petitioner asserted it was

"widely known among physicians specializing in psychiatry" that dosages of stimulants used in the treatment of ADHD can "appropriately be higher than the dosages recommended by the pharmaceutical manufacturer," and she attached a medical journal article intended to substantiate her assertion. Petitioner also sought to rebut Dr. Gray's criticism of prescribing Adderall and Vyvanse in combination to patient J.M.B. Petitioner stated she "would not expect a general practice physician such as [Dr. Gray] to understand and appreciate the complexities of prescribing appropriate doses of stimulants to patients as such physicians generally do not treat ADHD," and petitioner attached a medical journal article that she characterized as supporting the practice of prescribing a long-acting stimulant (like Vyvanse) with a short-acting stimulant (like Adderall).[6]

After hearing extensive argument from counsel, the trial court issued an order granting in part the petition to enforce the administrative subpoenas. The court concluded the psychotherapist-patient privilege did not protect the subpoenaed records because Business and Professions Code section 2225 abrogates the privilege for purposes of a Board disciplinary investigation of a physician, including petitioner. The trial court agreed patients had a constitutional privacy right that covers information in their medical records but found the "right is not absolute, and must be balanced against other important interests." Applying a "good cause" test, the court found the factual basis for the subpoenas set forth in Dr. Gray's declaration

---

[6] Petitioner also briefly addressed the prior disciplinary order entered against her by the Texas Medical Board. She stated: "The basis for the Texas Agreed Order is that I re-filled existing prescriptions for sleep medication for a family member."

was sufficient to compel disclosure of the specified records, with the exception of the fourth and fifth categories itemized in the subpoenas (seeking all correspondence and all billing records).

Petitioner thereafter filed a writ petition in this court seeking reversal of trial court's decision to order compliance with the subpoenas. Believing the issues presented by the petition warranted our consideration, we issued an order to show cause.

II

This is a case in two parts. We hold, first, that the psychotherapist-patient privilege does not protect the subpoenaed records from disclosure to the Department. Business and Professions Code section 2225, a statute enacted after codification of the psychotherapist-patient privilege, permits disclosure of records that the psychotherapist-patient privilege would otherwise shelter when the Department and the Board are investigating potential improper prescribing of controlled substances by a psychiatrist. We further hold, second, that a psychiatric patient's constitutional right to privacy requires the Department to demonstrate a subpoena for the patient's records is supported by a compelling interest and that the information demanded is "relevant and material" (*Wood v. Superior Court* (1985) 166 Cal.App.3d 1138, 1148-1149 (*Wood*)) to the particular investigation being conducted.

Here, the State has a compelling interest in investigating excessive or otherwise improper prescribing of controlled substances, and Dr. Gray's declaration establishes most of the records demanded by the subpoena are relevant and material to that investigation. But the relevant and material standard is by no means toothless. Further narrowing of the Department's

12

subpoenas—specifically, elimination of a "catch-all" category of materials and related "including but not limited to" language—is required to comport with the weighty privacy interests at stake.

## A

The question of whether the psychotherapist-patient privilege bars disclosure of the subpoenaed records is a legal one, requiring us to analyze how Business and Professions Code section 2225 interacts with the privilege provisions of the Evidence Code. Our review is de novo. (*John v. Superior Court* (2016) 63 Cal.4th 91, 95; *Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724 (*Bruns*) ["Statutory interpretation is a question of law that we review de novo"]; see also *People v. Superior Court* (2015) 242 Cal.App.4th 692, 698 [courts should construe statutes in a manner that most closely comports with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose and avoiding a construction that would lead to unreasonable, impractical, or arbitrary results].)

## 1

In May 1965, then-Governor Pat Brown approved the Cobey-Song Evidence Act, which enacted California's Evidence Code. (Stats. 1965, ch. 299, §§ 1, 2, p. 1297.) As enacted, the Evidence Code included two Articles that are of interest to us in this proceeding: one that codified a physician-patient privilege and another that codified a psychotherapist-patient privilege. (Stats. 1965, ch. 299, §2, pp. 1329-1333.) These two privileges remain part of the Evidence Code today.

Evidence Code sections 990 et seq. comprise Division 8, Chapter 4, Article 6 of the code, entitled "Physician-patient Privilege." Evidence Code sections 990 and 991 define "physician" and "patient" consistent with the common understanding of those terms, and Evidence Code section 994 provides, with certain statutory exceptions, that "the patient . . . has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and physician . . . ." Among the statutory exceptions to the physician-patient privilege is Evidence Code section 998, which makes the privilege inapplicable in a criminal proceeding, and Evidence Code section 1007, which states the privilege does not apply "in a proceeding brought by a public entity to determine whether a right, authority, license, or privilege . . . should be revoked, suspended, terminated, limited, or conditioned."

The very next Article of the Evidence Code, Article 7, is entitled "Psychotherapist-patient Privilege." Evidence Code section 1010 defines those who are considered "psychotherapists" for purposes of the privilege. A person like petitioner who is "authorized to practice medicine in any state or nation [and] . . . devotes . . . a substantial portion of his or her time to the practice of psychiatry" qualifies (Evid. Code, § 1010, subd. (a)), but so do many others, including licensed psychologists, clinical social workers, marriage and family therapists, and professional clinical counselors (Evid. Code, § 1010, subds. (b), (c), (e), (n)).[7] Evidence Code section 1014 incorporates this definition

---

[7]     Previously, psychologists' communications with patients were privileged under former Business and Professions Code section 2904, but that statute made no reference to psychiatrists. (Stats. 1957, ch. 2320, § 1, p. 4038.) In 1965, with enactment of

14

of a psychotherapist and states: "Subject to [Evidence Code] Section 912 [governing waiver of privileges] and except as otherwise provided in this article, the patient . . . has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist . . . ." (Evid. Code, § 1014; see also Evid. Code, § 1015 [obligating a psychotherapist to claim the privilege on a patient's behalf unless the patient authorizes disclosure].) The exceptions to the psychotherapist-patient privilege enumerated in Article 7 of the Evidence Code differ in some respects from those concerning the physician-patient privilege: among other things, there is no provision that renders the psychotherapist-patient privilege inapplicable in criminal proceedings, nor is there a provision that states the privilege does not apply in licensing proceedings brought by a public entity.

The Law Revision Commission Comment prepared in connection with the enactment of the Evidence Code in 1965 explains why the psychotherapist-patient privilege is treated differently than the physician-patient privilege: "This article creates a psychotherapist-patient privilege that provides much broader protection than the physician-patient privilege. [¶] Psychiatrists now have only the physician-patient privilege which

---

the Evidence Code, the Legislature re-defined the term "psychotherapist" to include a certified psychologist and a medical doctor who devotes (or is reasonably believed by a patient to devote) a substantial portion of his or her practice to psychiatry. (Stats. 1965, ch. 299, §2, p. 1331; see also Stats. 1965, ch. 553, § 1, p. 1879 [repealed when Evidence Code enacted].) Over the years since, the Legislature has added other mental health professionals to the list of those considered to be a "psychotherapist."

is enjoyed by physicians generally.  On the other hand, persons who consult certified psychologists have a much broader privilege under [former] Business and Professions Code Section 2904 (superseded by the Evidence Code).  There is no rational basis for this distinction.  [¶]  A broad privilege should apply to both psychiatrists and certified psychologists.  Psychoanalysis and psychotherapy are dependent upon the fullest revelation of the most intimate and embarrassing details of the patient's life.  Research on mental or emotional problems requires similar disclosure.  Unless a patient or research subject is assured that such information can and will be held in utmost confidence, he will be reluctant to make the full disclosure upon which diagnosis and treatment or complete and accurate research depends.  [¶] The Law Revision Commission has received several reliable reports that persons in need of treatment sometimes refuse such treatment from psychiatrists because the confidentiality of their communications cannot be assured under existing law.  Many of these persons are seriously disturbed and constitute threats to other persons in the community.  Accordingly, this article establishes a new privilege that grants to patients of psychiatrists a privilege much broader in scope than the ordinary physician-patient privilege.  Although it is recognized that the granting of the privilege may operate in particular cases to withhold relevant information, the interests of society will be better served if psychiatrists are able to assure patients that their confidences will be protected." (Cal. Law Revision Com. com., reprinted in Deering's Ann. Evid. Code (2004 ed.) foll. § 1014, p. 217.); see also *In re Lifschutz* (1970) 2 Cal.3d 415, 434, fn. 20 [citing this comment as evidence of what the Legislature

16

"acknowledged" when recognizing the psychotherapist-patient privilege].)

In July 1965, roughly two months after approving the bill that enacted the statutory privileges we have just discussed, then-Governor Brown approved an act amending certain provisions of the Business and Professions Code pertaining to the Board's licensing and disciplinary functions. (Stats. 1965, ch. 1458, p. 3413.) Section 7 of this act amended former section 2379 of the Business and Professions Code. That statute deemed the willful betraying of a "professional secret" by a physician to be unprofessional conduct, and the July 1965 amendment added language stating "[n]either this section nor any other provision of law making communication between a physician and surgeon and his patient a privileged communication shall apply to investigations or proceedings conducted under this act." (Stats. 1937, ch. 399, p. 1274; Stats. 1937, ch. 414, § 3, p. 1377; Stats. 1965, ch. 1458, § 7, p. 3415.)

Later in 1980, the Legislature repealed former Business and Professions Code section 2379 as part of its reorganization of the Medical Practice Act. (Stats. 1980, ch. 1313, § 1.6, p. 4445.) In place of former section 2379, the 1980 reorganization added section 2225 to the Business and Professions Code. (Stats. 1980, ch. 1313, § 2, p. 4472.) The Legislature has amended section 2225 seven times since 1980, but the sentence in the statute that is important for our purposes has remained virtually unchanged. It reads: "Notwithstanding [Business and Professions Code] Section 2263 and any other law making a communication between a physician and surgeon or a doctor of podiatric medicine and his or her patients a privileged communication, those provisions shall not apply to investigations or proceedings

17

conducted under this chapter." (Bus. & Prof. Code, § 2225, subd. (a).)

2

There really is no dispute that the records subpoenaed by the Department are records described by the psychotherapist-patient privilege provisions of the Evidence Code. And our Supreme Court has observed "privilege is a legislative creation, which courts have no power to limit by recognizing implied exceptions." (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 739.) That means the subpoenaed records are privileged unless Business and Professions Code section 2225 makes the psychotherapist-patient privilege statutes inapplicable when the Board is investigating whether it should discipline a physician it has licensed to treat the sick or afflicted in this state. In our judgment, it does.

Business and Professions Code section 2225, subdivision (a) states that the provisions of "any other law making a communication between a physician . . . and his or her patients a privileged communication" do not apply in an investigation conducted pursuant to the provisions of the Medical Practice Act. Petitioner reads this provision as if the language quoted immediately above is no different than an express reference to the physician-patient privilege; she characterizes the trial court, for instance, as having found the subpoenaed records "come within [Business and Professions Code] section 2225, subdivision (a)'s *exception to the physician-patient privilege of Evidence Code section 994*[ ] because all psychiatrists are physicians . . . ." (Emphasis added.) While the Legislature certainly could have drafted Business and Professions Code section 2225, subdivision

18

(a) to make express reference to the physician-patient privilege or to Evidence Code section 994,[8] the text the Legislature chose is not so limited.

The key sentence in Business and Professions Code section 2225, subdivision (a) does not refer to Division 8, Chapter 4, Article 6 of the Evidence Code, i.e., the code's physician-patient privilege provisions, but rather to "any other law" that would make a communication between a physician and a patient privileged. Put more simply, the text of Business and Professions Code section 2225, subdivision (a) refers to an indefinite legal circumstance, not a narrow group of particular statutes. The plain text of the statute commands that insofar as *any* other laws would apply to make communication between a physician and one of his or her patients privileged (at least for laws that pre-date section 2225's enactment), those laws are abrogated for purposes of a Medical Practice Act disciplinary investigation.

So understood, the records the Department seeks from petitioner are not privileged from disclosure. Under Business and Professions Code section 2225, subdivision (a) we need only ask whether petitioner is a physician, whether the Department and the Board are conducting an investigation under the Medical Practice Act, and whether there are laws that would otherwise make her communications with the three identified patients privileged. The answer to all three questions is yes.

First, petitioner is unquestionably a physician—that she specializes exclusively in psychiatry does not make her any less

---

[8]     As we have already detailed *ante*, the Legislature and Governor enacted the relevant privilege statutes before enacting the predecessor statute to what is now Business and Professions Code section 2225.

of a medical doctor; the designations "physician" and "psychiatrist" are not mutually exclusive. Second, it is undisputed the subpoenas were issued in connection with a Medical Practice Act investigation. And third, there are indeed laws that would make petitioner's communications with the three individuals named in the subpoenas privileged—the Evidence Code provisions concerning the physician-patient privilege are one group of such laws, but so are the Evidence Code statutes that govern the psychotherapist-patient privilege. (Evid. Code, § 1010, subd. (a) [defining "psychotherapist" as any "*person authorized to practice medicine in any state or nation* who devotes, or is reasonably believed by the patient to devote, a substantial portion of his or her time to the practice of psychiatry"] (emphasis added).) Business and Professions Code section 2225, subdivision (a) accordingly abrogates both privileges.

Our reading of section 2225, subdivision (a) accords with the recognized purpose of the Medical Practice Act. "[T]he Legislature established revocation and suspension proceedings for medical licenses in order to protect the life, health and welfare of the people at large and to set up a plan whereby those who practice medicine will have the qualifications which will prevent, as far as possible, the evils which could result from ignorance or incompetency or a lack of honesty and integrity." (*Borden v. Division of Medical Quality* (1994) 30 Cal.App.4th 874, 883, internal quotation marks and citation omitted.) Business and Professions Code section 2225, subdivision (a) facilitates this purpose by ensuring Department and Board investigators have access to materials that allow them to monitor those the Board has authorized to practice medicine. The Legislature certainly

20

intended the psychotherapist-patient privilege to apply broadly, but we do not believe the Legislature intended to empower a physician like petitioner—who can prescribe medications to her patients only by virtue of having received a physician's and surgeon's certificate from the Board (Bus. & Prof. Code, §§ 2051, 2052)—to refuse legitimate demands for information from the very entity charged with enforcing the regulatory regime that enables her to practice medicine.[9]  We therefore reject petitioner's reading of Business and Professions Code 2225, which would do just that: rendering those physicians with a substantial psychiatry practice immune from Board discipline except in those instances where the Board can investigate and prove a violation without use of compulsory process.[10]

Petitioner argues, however, that Business and Professions Code section 2225, subdivision (a) cannot operate as a statutory

---

[9]     The Legislature has obligated psychiatrists to assert the psychotherapist-patient privilege on their patients' behalf unless they affirmatively consent to disclosure.  (Evid. Code, § 1015.)  While we recognize the privilege ultimately belongs to, and is primarily intended to protect, patients, the Medical Practice Act is founded at least in part on the notion that Board oversight of the medical profession is necessary because patients will not always have the knowledge or expertise necessary to understand they may be receiving substandard care.

[10]     There is no logical reason to believe there would be many such cases, at least when the nature of the investigation concerns a patient who is addicted to controlled substances he or she is receiving from an overprescribing physician.  Such a patient will have little incentive to consent to disclosure of records that might reveal his or her abuse of prescription medication.

exception to the psychotherapist-patient privilege because it would conflict with Evidence Code section 1014, which states the privilege applies "[s]ubject to [Evidence Code] Section 912 and except as otherwise provided in this article." That is to say, in petitioner's view, only those statutory exceptions enumerated in Division 8, Chapter 4, Article 7 of the Evidence Code can defeat the protection provided by the psychotherapist-patient privilege.[11] This argument fails because it runs contrary to hornbook statutory interpretation principles.

It is well established that a statute enacted later in time controls over an earlier-enacted statute, and it is equally well-established that a specific statute prevails over a statute that is more general. (*State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 946, 960-961 (*DPH*) [more specific and later-enacted long-term care statute properly construed as a limited exception to general rule of patient confidentiality set forth in Welfare and Institutions Code section 5328]; see also Gov. Code, § 9605 ["In the absence of any express provision to the contrary in the statute which is enacted last, it shall be conclusively presumed that the statute which is enacted last is intended to prevail over statutes which are enacted earlier at the same session . . ."]; Code Civ. Proc., § 1859 ["when a general and particular provision are inconsistent, the latter is paramount to the former"].) Relative to the psychotherapist-patient privilege provisions of the Evidence Code, Business and Professions Code

_____

[11] Petitioner notes, correctly, that there is no exception for administrative licensing proceedings in the Article of the Evidence Code pertaining to the psychotherapist-patient privilege, although there is such an exception in the Article that pertains to the physician-patient privilege (Evid. Code, § 1007).

22

section 2225, subdivision (a) is both later-enacted and more specific. It was enacted after the relevant Evidence Code statutes in 1965, and it was also re-enacted in 1980 as part of the reorganization of the Medical Practice Act. In addition, Business and Professions Code section 2225, subdivision (a) applies to a specific, narrow category of proceedings, i.e., those under the Medical Practice Act, unlike the privilege provisions of the Evidence Code that have more general application and cover a wider range of investigations and litigation. Business and Professions Code section 2225, subdivision (a) is therefore properly construed as a limited exception to the psychotherapist-patient privilege notwithstanding the "except as otherwise provided" language included in Evidence Code section 1014 when it was enacted.

These principles of interpretation help explain why petitioner's reliance on *City of Alhambra v. Superior Court* (1980) 110 Cal.App.3d 513 (*City of Alhambra*) is unavailing.[12] In that case, a plaintiff alleging police misconduct propounded interrogatories asking the officer in question whether he had received psychiatric treatment. (*Id.* at p. 518.) The trial court ordered the officer to answer the interrogatories, but the Court of Appeal reversed, concluding the psychotherapist-patient privilege

---

[12] The Fourth District Court of Appeal's decision in *Kirchmeyer v. Phillips* (2016) 245 Cal.App.4th 1394 has no relevance to the privilege issue we decide. In that case, the Board forfeited the argument we address at length: whether Business and Professions Code section 2225, subdivision (a) vitiates the psychotherapist-patient privilege in a disciplinary investigation under the Medical Practice Act. (*Id.* at pp. 1404-1405.)

23

barred disclosure. (*Id.* at p. 519.) In reversing, the appellate court rejected the plaintiff's argument that Evidence Code section 999 authorized disclosure. That statute provides for an exception to the *physician*-patient privilege Article of the Evidence Code, and the court reasoned the absence of any comparable exception in the psychotherapist-patient privilege Article of the Evidence Code meant the information sought by the interrogatories was protected from compelled disclosure. (*Id.* at p. 519.)

The differences between *City of Alhambra* and this case are readily apparent. For reasons we have explained, Business and Professions Code section 2225, subdivision (a) is correctly understood as an exception to the psychotherapist-patient privilege and, as a later-enacted, more specific statute, section 2225 trumps any conflicting language in the Evidence Code—including the "except as otherwise provided in this article" language in Evidence Code section 1014.

Petitioner also heavily relies on the Law Revision Commission Comment accompanying Evidence Code section 1014 and argues it is evidence of an intent by the Legislature to codify a broad psychotherapist-patient privilege without a "patchwork" exception that would treat psychiatrists differently than psychologists for purposes of whether communications with patients should be privileged. It is true that Business and Professions Code section 2225, as we read it, does require treating patient communications with a psychiatrist differently than patient communications with a psychologist or any of the other mental health professionals specified in Evidence Code section 1010. But the rejoinder is obvious: that result is the product of the text the Legislature enacted. (See *Even Zohar Const. & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61

Cal.4th 830, 837-838 [statute's actual words most reliable indicator of legislative intent].)  Even if the Law Revision Commission Comment is a reliable indication of the Legislature's intent at the time it enacted the Evidence Code, there is no reason why the Legislature could not have later concluded a narrow carve-out to the otherwise broad psychotherapist-patient privilege was required for Medical Practice Act investigations.[13]

In fact, the existence of salient differences between psychiatrists and other mental health professionals *for purposes of Board investigations* provides good reason to believe that is precisely what the Legislature concluded.  As we have already explained, physicians like petitioner are entitled to practice medicine—and to prescribe highly addictive controlled substances—only because they have a certificate from the Board that authorizes them to do so.  (Bus. & Prof. Code, §§ 2051, 2052; Health & Saf. Code, § 11150.)  None of the other mental health

---

[13]     Petitioner also argues Business and Professions Code "[s]ection 2225 itself precludes any implication that its exception to the physician-patient privilege was intended by the Legislature to create an exception also to the psychotherapist-patient privilege" because the "procedural limitations on the Board's authority to inspect patient records" found in subdivisions (b)(1) and (b)(2) of the statute would be unnecessary if patient records could be subpoenaed without regard to patient consent.  To the extent it is comprehensible, the argument has no force.  The key sentence in Business and Professions Code section 2225, subdivision (a) pertains to any "investigation[ ] or proceeding[ ] conducted under this chapter," i.e., the Medical Practice Act.  The investigation involved in this case is undoubtedly such an investigation, and for reasons we have already detailed, the Department was entitled to issue subpoenas in furtherance of that investigation.

25

professionals listed in Evidence Code section 1010 are similarly entitled to write prescriptions (see, e.g., Bus. & Prof. Code, § 2904 ["The practice of psychology shall not include prescribing drugs . . ."]), nor are those professionals subject to discipline by the Board.  A conclusion that relatively greater investigative latitude is required for the Board to monitor psychiatrists and protect the patients who see them, in light of the relatively greater potential for harm that arises from the authority psychiatrists possess to prescribe dangerous drugs, represents no arbitrary "patchwork" exemption but rather an entirely sensible legislative discrimination.

We do recognize the Legislature could have expressed its intentions regarding the applicability of the psychotherapist-patient privilege in a Medical Practice Act investigation even more clearly than it has.  (Compare, e.g., Pen. Code, § 11171.2 [providing that "[n]either the physician-patient privilege nor the psychotherapist-patient privilege" apply to child abuse and neglect information reported in a court proceeding or administrative hearing].)  But Business and Professions Code section 2225, subdivision (a) has a plain meaning in our view— one that makes exception to the psychotherapist-patient privilege for Board investigations—and it has never been the practice of courts to insist the Legislature speak in precisely the manner a court might prefer if the legislative intention is sufficiently clear. Of course, if we have misjudged that intent, if the Legislature's desire was to create an entirely inviolate psychotherapist-patient privilege notwithstanding the indicia that suggest otherwise, the Legislature remains free to say so.  But on the state of the law as it stands, the records demanded in the Department's subpoenas are not protected by the psychotherapist-patient privilege.

26

B

To say the medical records subpoenaed by the Department are not covered by a statutory privilege is to answer only one of the two questions presented in this case. We still must address whether the subpoenas infringe on M.L., L.R., and J.M.B.'s constitutional right to privacy, and if so, whether the Department has made a sufficient showing to justify such infringement. Apparently applying a general balancing test, the trial court concluded the Department had made such a showing as to four of the subpoenas' categories (that call for treatment and testing records, x-ray or other imaging records, pathology reports and lab data, and "all other data . . . which would reveal all medical care provided") but not for the remaining two categories (all correspondence and all billing records).

The question of whether patients have a state constitutional right to privacy that protects information contained in their medical records is, in our view, an easy one. Beyond peradventure, they do. (*In re Lifschutz, supra*, 2 Cal.3d at pp. 431-432; *Fett v. Medical Board of California* (2016) 245 Cal.App.4th 211, 216 [citing cases recognizing patients' privacy rights concerning information in their medical records] (*Fett*); *Wood, supra*, 166 Cal.App.3d at p. 1147 ["[E]xamination of medical records [is] within the purview of the privacy amendment"]; *Board of Medical Quality Assurance v. Gherardini* (1979) 93 Cal.App.3d 669, 678-679 (*Gherardini*).) More open to debate, however, are the issues of whether a compelling interest must be shown to overcome this privacy interest, and the extent of the required nexus between the information the Department demands and the interest asserted to justify its production.

27

Citing *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 (*Hill*), the Department contends a "general balancing test" is all that is necessary to overcome the medical privacy right at issue in this case. We are not persuaded this is the correct approach. To be sure, *Hill* does say that not every assertion of a privacy interest must be overcome by a compelling interest; rather, such an interest need only be shown for those "vital" privacy interests that "involve[ ] an obvious invasion of an interest fundamental to personal autonomy." (*Id.* at p. 34.) In so holding, however, our Supreme Court cited to several of its prior cases to distinguish those where a showing of a compelling interest had been found necessary from those where general balancing tests were employed. Among the citations is *People v. Stritzinger* (1983) 34 Cal.3d 505, which the *Hill* court describes as a case that held a "patient's privacy interest in psychotherapy must yield to compelling state interests." (*Hill*, *supra*, at p. 34, fn. 11; see also *Wood, supra*, 166 Cal.App.3d at pp. 1147-1148 [Board must show compelling interest to overcome privacy right]; *Gherardini, supra*, 93 Cal.App.3d at p. 680 [same]; cf. *Kirchmeyer v. Phillips*, *supra*, 245 Cal.App.4th at p. 1404 [holding the Board must demonstrate a compelling interest, but basing its holding in part on the conclusion that the psychotherapist-patient privilege, not just the state constitutional right to privacy, applied].) We read the citation to *People v. Stritzinger* as an indication of the interest that must be shown in a case like this one, and we hold the Department must therefore demonstrate a compelling interest to overcome the patients' right to privacy in their psychiatric records.

There is ample reason to conclude the State has a compelling interest in a case like this one that involves an investigation into excessive or improper prescribing of controlled substances.  The Legislature itself has emphasized the importance of such investigations by directing the Board to prioritize its resources on certain matters believed to represent "the greatest threat of harm," including "[r]epeated acts of clearly excessive prescribing . . . of controlled substances, or repeated acts of prescribing . . . controlled substances without a good faith prior examination of the patient and medical reason therefor." (Bus. & Prof. Code, § 2220.05, subd. (a)(3).)  The Court of Appeal in *Wood* also expressly held the Board's interest in obtaining information for use in such an investigation is compelling. (*Wood*, *supra*, 166 Cal.App.3d at p. 1147 ["That there is a strong governmental interest in regulating the prescription of drugs by physicians cannot be gainsaid"].)  We likewise so hold.

Petitioner, however, advances what can be construed as a variant on her argument that no compelling interest supports the subpoenas in this case.  She contends that even if the State has a compelling interest in investigating improper prescribing of controlled substances as a general matter, the Department and the Board cannot assert that interest here because those entities have not competently demonstrated adequate predication for their investigation of petitioner.  Each of the contentions petitioner makes in this regard is unpersuasive.

Petitioner contends Dr. Gray's declaration is not competent to demonstrate the Board has sufficient predication for its investigation into petitioner's controlled substance prescribing practices because Dr. Gray is a specialist in internal medicine, not psychiatry.  The trial court concluded Dr. Gray was

29

sufficiently qualified to competently render an opinion, and we review that determination for abuse of discretion. (*Fett, supra,* 245 Cal.App.4th at p. 222; *Whitney v. Montegut* (2014) 222 Cal.App.4th 906, 917-918.) While a declaration from a psychiatrist may have been more persuasive, we do not believe the trial court abused its discretion in finding Dr. Gray competent to render an opinion on the potential dangers presented by the dosages of Adderall and Vyvanse petitioner prescribed to the three patients in question. Dr. Gray declared she was familiar with the applicable standard of care, and she did not opine on whether petitioner accurately diagnosed whether the patients were suffering from mental health conditions requiring treatment—indeed, the diagnosis that led to the prescriptions is unknown. Rather Dr. Gray opined on the nature and properties of the drugs prescribed, their potential complications, and the precautions that should be taken by a physician who prescribes the medications. So far as the record before us reveals, these are all topics sufficiently within the training and experience of a physician with a specialty in internal medicine.[14]

_____

[14] Petitioner asserts the trial court "failed to consider" the medical journal articles she submitted in an effort to show her prescribing practices were appropriate. There is no reason to believe this is so—counsel for petitioner specifically highlighted the two articles during the hearing on the Department's petition to enforce the subpoenas. Regardless, the medical journal articles are also not as supportive of petitioner's position as she appears to believe.

The first article does describe successful treatment of an adult suffering from ADHD with a higher than normal dose of a stimulant (methylphenidate). But even assuming all three

Petitioner also contends Dr. Gray's declaration is deficient because Dr. Gray formed her opinion based on CURES reports which petitioner argues are "unreliable hearsay."[15]  Even assuming for argument's sake courts cannot, as a general matter, consider hearsay when deciding whether to grant a petition to compel compliance with an administrative subpoena, Dr. Gray is an expert and the trial court did not abuse its discretion in concluding Dr. Gray could rely on and recite the CURES report data in explaining the basis for her opinion.  (Evid. Code, §§ 801,

patients here were actually diagnosed with ADHD, the authors of the article explain that "[t]o [their] knowledge, this is the first reported case of high-dose treatment in a patient with adult ADHD" and they caution "clinicians to monitor clinical symptoms when using high doses."  As Dr. Gray explains, the subpoenas are at least partly intended to discover whether petitioner engaged in this sort of monitoring of M.L., L.R., and J.M.B.  The second article states combination pharmacotherapy (using long and short acting stimulants) is "a common practice," but it says nothing about the particular dosages petitioner prescribed in this case and it similarly cautions that physicians must monitor patients for side effects, especially cardiovascular effects—which, again, were referenced as a point of concern by Dr. Gray in her declaration.

[15]    Petitioner notes our Supreme Court has granted review in a case to decide whether a physician's patients have a protected privacy interest in CURES data and, if so, whether disclosure of such data to the Board is justified by a compelling state interest. (*Lewis v. Superior Court* (2014) 226 Cal.App.4th 933, review granted Sept. 17, 2014, S219811.)  She makes no argument, however, that it was inappropriate for the Board to access the CURES data for its investigation in this case.

subd. (b), 802; *People v. Sanchez* (2016) 63 Cal.4th 665, 678-679; see also *People v. Dean* (2009) 174 Cal.App.4th 186, 193.)

More broadly, petitioner contends the facts and opinions related in the declarations of Dr. Gray and Investigator Coleman do not give rise to adequate suspicion to justify an investigation into whether petitioner is violating laws concerning the prescribing of controlled substances. We find the argument unpersuasive. Dr. Gray's opinion, set forth in her detailed declaration and grounded in her review of the reports detailing the amount of controlled substances petitioner prescribed in comparison to the recommended dosages, may well have sufficed by itself to establish the suspicion that would justify commencing an investigation. (*Arnett v. Dal Cielo, supra*, 14 Cal.4th at p. 8 [Board may investigate merely on suspicion the law is being violated].) But there was more. Investigator Coleman explained she spoke with M.L. and M.L. denied petitioner had treated her at all. While M.L. might have simply been reluctant to admit she had been treated by a psychiatrist, her denial is another reason why the Department and the Board would reasonably conclude an investigation was warranted. In addition, petitioner has previously been disciplined by the Texas Medical Board for improperly prescribing sleep medication, and this is yet another fact on which the Board could properly rely to conclude there was good reason to investigate petitioner's prescribing practices as to M.L., L.R., and J.M.B.


2

Petitioner argues that even if the Department and the Board have a compelling reason to seek information contained in the medical records of M.L., L.R., and J.M.B., the Department

and the Board must proceed by the least intrusive manner available. Insofar as she contends the entities were required to pursue voluntary means of obtaining the information sought before resorting to compulsory process, the contention is sound. (*Whitney v. Montegut, supra*, 222 Cal.App.4th at pp. 918-919; *Wood, supra*, 166 Cal.App.3d at p. 1149 ["The first constraint appropriate to accommodate the privacy interest of the patient is that the board must take reasonable steps to notify the patient of its proposed examination"]; see also *Valley Bank of Nev. v. Superior Court* (1975) 15 Cal.3d 652, 658.) There is no dispute the Department and the Board pursued such means in this case.

On the other hand, to the extent petitioner contends the items demanded in the subpoenas must be narrowly tailored to the interest in investigating the improper prescription of controlled substances, the contention is wide of the mark. The high burden imposed by a strict narrow tailoring requirement is inconsistent with the investigatory stage that precedes a formal accusation, where the information available to the Department may be sparse and the ability to craft highly targeted demands for information is often limited. We instead agree with prior cases that have held information demanded by an administrative subpoena in a case like this must be "relevant and material" to the investigation being conducted. (*Wood, supra*, 166 Cal.App.3d at p. 1149 ["The board must demonstrate that the particular records it seeks are 'relevant and material to the board's inquiry' whether the petitioners have improperly prescribed Schedule II drugs"]; accord, *Bearman v. Superior Court* (2004) 117 Cal.App.4th 463, 469 (*Bearman*).) That does not mean, of course, the "relevant and material" standard is easily satisfied; rather, administrative subpoenas must still be carefully crafted to

winnow out immaterial records.  (*Bearman*, *supra*, at p. 472; *Wood*, *supra*, at pp. 1148-1149.)

All of the categories in the subpoenas here are limited to seeking information in the patients' medical records during the time periods Dr. Gray identified as suspect after reviewing the CURES report.  Such a time limitation is an important constraint that helps ensure the items demanded are relevant and material to the investigation.  Although confining a subpoena to a limited, defined time period will almost always be necessary to satisfy the relevance and materiality requirement, rarely if ever will such a time limitation alone be sufficient.  Here, however, Dr. Gray's declaration also supplies a sufficient factual predicate to explain why the specific items requested in the first through third categories of the subpoenas are relevant and material to determining whether petitioner improperly prescribed Adderall and Vyvanse to the three patients.  (Compare, e.g., *Wood*, *supra*, 166 Cal.App.3d at p. 1150 [order compelling subpoena compliance reversed where Board made no evidentiary showing as to how often similarly-situated physicians might prescribe drugs in question or the likelihood the prescriptions could have been properly issued]; *Gherardini*, *supra*, 93 Cal.App.3d at p. 681 [order compelling compliance with subpoena reversed where declaration "sets forth no facts, no showing of relevance or materiality of the medical records" and instead merely makes reference to a broad investigation enabling statute].)

The same cannot be said for two other aspects of the subpoenas.  First, the subpoenas demand "[t]he complete medical record" which is defined to "include[ ], but [not be] limited to" the six more specific categories in the subpoena.  This expansive "including but not limited to language" is entirely inconsistent

34

with the relevant and material standard; a subpoena must itemize, at least by category, the materials to be produced. The subpoenas also demand in category six "all other data, information or record which would reveal all medical care provided to the patient." This sort of "catch-all" category is also unjustified; it is tantamount to a request for the patients' entire medical file during the operative time period. As we have said, a time limitation alone will rarely suffice to appropriately cabin a subpoena's demand for private information of the type sought in this case.

DISPOSITION

The petition is granted in part.  Let a writ of mandate issue ordering respondent court to vacate its May 20, 2016, order on the Petition for Order to Enforce Subpoenas filed by Real Parties in Interest and to issue a new and different order consistent with the views expressed in this opinion, i.e., granting the Petition for Order to Enforce Subpoenas only as to categories one through three in the Department's subpoenas.  All parties shall bear their own costs in this proceeding.

**CERTIFIED FOR PUBLICATION**


BAKER, J.


I concur:


KRIEGLER, Acting P.J

KUMAR, J.\* Concurring

I agree with the approach taken by the majority.  I respectfully write separately to point out that a trial court's ruling on the issue of whether a subpoena seeks records that are "relevant and material" to a compelling interest is subject to review for abuse of discretion.  (See *McLane Co. v. EEOC* (2017) 581 U.S. __, __ [197 L.Ed.2d 500, 508-511] [district court's decision to enforce or quash an EEOC subpoena is reviewed for abuse of discretion]; see also *Manela v. Superior Court* (2009) 177 Cal.App.4th 1139, 1146 [whether trial court properly quashed subpoena based on the physician-patient privilege reviewed for abuse of discretion]; *Muhammad v. State* (Fla. 2013) 132 So.3d 176, 189-191 [state supreme court applies abuse of discretion standard in reviewing whether the trial court properly quashed subpoenas of a party seeking to prove a journalist's qualified privilege was overcome by, among other things, a compelling interest for disclosure].)  The result reached by the majority is in harmony with the application of this standard.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.