Filed 1/22/19; Certified for Publication 2/21/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DEAN GRAFILO, as Director, etc., | B285193 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS169143) |
| v. | |
| KAMYAR COHANSHOHET, | |
| Defendant and Appellant; | |
| MEDICAL BOARD OF CALIFORNIA, | |
| Real Party in Interest and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County. Michelle Williams Court and Joseph R. Kalin, Judges. Reversed.

Fenton Law Group, Benjamin J. Fenton, Dennis E. Lee and Alexandra De Rivera for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Xavier Becerra, Attorney General, Gloria L. Castro, Assistant Attorney General, Judith L. Alvarado and Tan N. Tran

Deputy Attorneys General for Real Party in Interest and Respondent, Medical Board of California.

_____

Dr. Kamyar Cohanshohet appeals from the superior court's order to produce the medical records of five of his patients in connection with an investigation into his prescription of controlled substances to these patients. Because the state has failed to demonstrate good cause to obtain these records, we reverse the order.

## PROCEDURAL BACKGROUND

*The Investigation*

In 2014, the Medical Board of California (the Board) received an anonymous complaint alleging Dr. Cohanshohet "prescribes huge quantities of narcotics to patients without giving exams, tests, x-rays or even bloodwork. A loved one went to this doctor and is now in rehab. Not once did this doctor examine him, look at charts. He only went by a complaint of pain and started prescribing narcotics at $400 a visit every two weeks. He is in partnership with a pharmacy in his building."

An investigator for the Board obtained a report from the Controlled Substance Utilization Review and Evaluation System (CURES), a database maintained by the California Department of Justice. The CURES report for Dr. Cohanshohet shows the Schedule II, III, and IV controlled substances prescribed by him to patients between July 27, 2014 and July 27, 2015.

Dr. Shoaib Naqvi works as a medical consultant for the Health Quality Investigation Unit of the Department of Consumer Affairs. He identified five patients who were prescribed dosages of opioids that were possibly in excess of the

recommended amount.  These five patients were notified of the investigation and asked to sign releases for their medical records.  They refused.  As a result, subpoenas duces tecum were served on June 30, 2016, for the medical records of patients C.B., L.P., M.D., C.S., and R.V. for the time period between July 27, 2014 and July 27, 2015.  The patients were informed when the subpoenas were issued and advised of their right to object.  Dr. Cohanshohet refused to comply with the subpoena, asserting his patients' right to privacy.

*The Petition*

The Board subsequently filed a petition in the superior court for an order compelling the production of the medical records requested and for Dr. Cohanshohet's testimony.  In support of its petition to compel compliance of the subpoenas, the Board submitted the declarations of its investigator and Dr. Naqvi.  The investigator's declaration sets forth the impetus for the Board's investigation: an anonymous complaint that Dr. Cohanshohet overprescribed opioids to one patient without conducting an examination or screening of him or her.  The anonymous complaint also alleged Dr. Cohanshohet was in partnership with the pharmacy in his building.  The investigator further described the sequence of events leading to the petition, including obtaining the CURES report for Dr. Naqvi's review, attempting to obtain consent from the patients, and Dr. Cohanshohet's refusal to comply with the subpoenas.

Dr. Naqvi documented his role and his conclusions from reviewing Dr. Cohanshohet's CURES report.  He explained he is tasked with reviewing questionable medical and surgical practices of physicians licensed by the Board.  Thus, he maintains familiarity with the standard of medical practice in the

3

state of California.  Dr. Naqvi then in general terms explained the different classes of controlled substances, their potential for abuse, side effects, indicated use, and the standard of care for prescribing these substances.  He also provided details of 11 specific drugs prescribed by Dr. Cohanshohet, nine of which are used to treat pain.  The remaining two are used to treat anxiety, insomnia, or muscle spasms and seizures.

Dr. Naqvi further explained that morphine is used as the basis for a comparison of pain treatments to determine if the patient's opioid dosage is excessive.  He stated that knowing the morphine equivalent dosing (MED) is useful to evaluate different types of opioids and to convert from one opioid to another.  Opioid dosing may be considered excessive if the MED level exceeds 100 mg per day.  Dr. Naqvi noted an MED of greater than 100 mg per day "puts the patient at added risk for overdose and death."  The standard of care requires that the prescriber inform the patient of potential risks and benefits of the drug.  The patient must then provide informed consent, including being notified that death is a potential risk, when opioid dosing exceeds 100 mg MED per day.

Dr. Naqvi opined that good cause existed to believe that a violation of the Medical Practice Act (Bus. & Prof. Code, § 2000, et seq.) may have been committed by Dr. Cohanshohet.  Dr. Naqvi identified five patients who were prescribed controlled substances in a manner that appeared to deviate from the standard of care for prescribing these drugs.

Patient C.B. regularly received 90–120 (20mg) oxycodone HCL tablets along with 30 (20 mg) oxymorphone HCL tablets and 30 (10 mg) Valium tablets each month from July 27, 2014 to January 5, 2016.  Based on this information, C.B. may have taken three tablets of oxycodone, one tablet of oxymorphone HCL,

4

and one tablet of Valium a day, totaling at least 150 mg MED per day.  Dr. Naqvi noted the sedative effects of opioids are further aggravated by the use of Valium, resulting in a combination that has a "very real possibility of sedation to the point of respiratory arrest."  He concluded a review of C.B.'s medical record is necessary to confirm that an appropriate examination was done before prescribing this medication regimen, that regular assessments of the efficacy and effects of the treatment regimen were conducted and documented, and that the appropriate monitoring measures were performed.

Likewise, patient M.D. regularly received 90 (30 mg) oxycodone HCL tablets, 30 (4 mg) hydromorphone HCL tablets, 30 (10 mg) Valium tablets, and 60 (350 mg) carisoprodal tablets (a muscle relaxant) each month from July 27, 2014 to July 27, 2015.  According to Dr. Naqvi, this would appear to indicate three tablets of oxycodone, one tablet of hydromorphone HCL, two tablets of carispotrodal, and one tablet of Valium were taken each day, resulting in at least 106 mg MED.  This treatment regimen also presented the very real possibility of sedation to the point of respiratory arrest.

Patient L.P. regularly received 20–220 (10 mg) hydrocodone bitartrate-acetaminophen with 30–45 (350 mg) carispotrodal each month during the relevant time period, indicating the patient took five tablets of hydrocodone bitartrate-acetaminophen and one or two tablets of carisoprodal daily.  This combination appeared equivalent to a minimum of 75 mg MED.

Patient C.S. received prescriptions for 60–120 (10 mg) OxyContin tablets, 120–240 (325 mg–10 mg) Norco tablets, and 30–90 (10 mg) benzodiazepine or related drug (such as Valium, clonazepam, or temazepam, indicating 105–125 mg MED per day.

Patient V.R. received 120–150 (15 mg–20 mg) oxycodone HCL tablets with 20–60 benzodiazepine or related drugs (Valium (10 mg), Ambien, or Zaleplon). This would indicate four to five tablets of Oxycodone and one tablet of Valium along with a sleeping pill per day, resulting in 60–75 mg MED.

The prescriptions for L.P., C.S., and V.R. carried risks similar to those of patients C.B. and M.D. On this basis, Dr. Naqvi concluded these five patients may have received excessive amounts of opioids as compared to the recommended dosage. Dr. Naqvi explained the records are necessary to determine whether Dr. Cohanshohet performed an examination and screening of those patients, received informed consent, regularly assessed the efficacy and effects of the treatment regimen, and monitored those patients.

*The Opposition*

Four of the five patients submitted declarations objecting to the petition. Dr. Cohanshohet also opposed the petition, asserting the Board lacked good cause to justify the intrusion into his patients' privacy. He asserted in a declaration that he completed hundreds of hours of post-graduate training in pain management and palliative care and that some of his patients suffer from pain associated with acute injuries while others seek active cancer treatment, palliative care, or end-of-life care.

In addition, he proffered the declaration of Dr. Jack Berger, a physician certified in anesthesiology and who teaches pain medicine and pain management at USC. Dr. Berger reviewed Dr. Naqvi's declaration. He agreed that physicians who prescribe controlled substances to treat pain are required to complete a medical history and physical examination, diagnose the problem, inform the patient of any risks, and write a treatment plan which

states the objectives, proposed treatments, and justifications for the medications selected. He explained one of the primary functions of a pain management specialist is to monitor and guard against patient misuse and abuse of controlled substances such as opioids.

However, Dr. Berger challenged Dr. Naqvi's reliance on the CDC prescribing guidelines which were merely recommendations for primary care clinicians who are prescribing opioids for chronic pain outside of active cancer treatment, palliative care, and end-of-life care. These guidelines were not in effect at the time the patients in question were treated. He further contested Dr. Naqvi's conclusions as to each patient. Dr. Berger argued that a dosage greater than 100 mg MED does not automatically violate the standard of care, so long as the patient's informed consent was obtained. He found there was no reason to suspect Dr. Cohanshohet failed to perform a proper examination, obtain informed consent, or review the risks and benefits of higher dosage opioid therapy with the patient. He also opined that nonopioid alternatives would have presented similar risk of serious side effects, like morbidity.

*The Order*

The Hon. Joseph Kalin presided over the hearing on the Board's petition. After argument, he stated he would take the matter under submission and issue a ruling in "the next day or two." The Board served a notice of ruling a few weeks later indicating its petition had been granted, but no order was attached. Dr. Cohanshohet objected to the notice, arguing he received no communication from the trial court about its ruling. A different trial judge, the Hon. Michelle Williams Court, informed the parties at a later status conference that she spoke

7

with Judge Kalin, and he confirmed he granted the petition. Dr. Cohanshohet timely appealed.

Although Dr. Cohanshohet questions whether an order was ever issued, the parties are proceeding on the assumption a ruling was made.  Indeed, the record is sufficient to demonstrate the superior court granted the petition and ordered Dr. Cohanshohet to produce the requested records.  Therefore, we will treat the appeal as one from an appealable judgment. (*Dana Point Safe Harbor Collective v. Superior Court* (2010) 51 Cal.4th 1, 11–13 [order compelling compliance with administrative subpoena is appealable final judgment].)

## DISCUSSION

Dr. Cohanshohet contends the state's interest in his patients' medical records is insufficient to overcome their right to privacy.  He argues the Board lacks authority to issue subpoenas for records of noncomplaining patients.  In addition, the Board has failed to pursue less intrusive means of investigation. Finally, Dr. Cohanshohet argues the Board has failed to establish good cause for its investigation because the records sought have not been shown to be material or relevant to the investigation.

We are not persuaded the Board has demonstrated good cause to require Dr. Cohanshohet to produce the five patients' records.  Accordingly, we reverse the trial court's order.  In doing so, we need not address Dr. Cohanshohet's other grounds for reversal.

## I.  The Medical Board

The Board is a unit of the Department of Consumer Affairs.[1]  (Bus. & Prof. Code, § 101, subd. (b).)  It is tasked with

---

[1]  Although the director of Consumer Affairs is the plaintiff and respondent in this matter, the Board is the real party in

8

protecting the public against incompetent, impaired, or negligent physicians.  To accomplish this task, the Board is authorized to investigate complaints from the public that a physician may be guilty of unprofessional conduct.  (Bus. & Prof. Code, § 2220, subd. (a).)  A physician may only prescribe controlled substances when he holds a good faith belief that it is required for a patient's ailment, and only in a quantity and for a length of time that is reasonably necessary.  (Health & Saf. Code, § 11210.)  A violation of this provision constitutes unprofessional conduct (Bus. & Prof. Code, § 2238), and subjects the violator to disciplinary action by the Board (Bus. & Prof. Code, § 2234).

The Board's investigators have the status of peace officers (Bus. & Prof. Code, § 160), and possess a wide range of investigative powers, such as the power to issue subpoenas for the appearance of a witness or for the production of documents (Gov. Code, § 11181, subds. (a) & (e)).  The Board is authorized to issue a subpoena in "any inquiry [or] investigation" (Gov. Code, § 11181, subd. (e)), and may do so for purely investigative purposes; it is not necessary that a formal accusation be on file or a formal adjudicative hearing be pending.  (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 8; *Brovelli v. Superior Court* (1961) 56 Cal.2d 524, 528.)

If a party refuses to comply with the administrative subpoena, the Board may petition the superior court for an order compelling compliance.  (Gov. Code, §§ 11186–11187.)  "If it appears to the court that the subpoena was regularly issued . . . by the head of the department, the court shall enter an order that the person appear before the officer named in the

interest and we refer to it as the petitioner in this opinion rather than the Department of Consumer Affairs.

9

subpoena at the time and place fixed in the order and testify or produce and permit the inspection and copying of the required papers or other items described in subdivision (e) of Section 11181 as required . . . .  Upon failure to obey the order, the person shall be dealt with as for contempt of court."  (Gov. Code, § 11188.)

## II.    Standard of Review

The question of whether a subpoena meets the constitutional standards for enforcement is a question of law to be reviewed de novo.  (*Fett v. Medical Bd. of California* (2016) 245 Cal.App.4th 211, 216 (*Fett*); *Millan v. Restaurant Enterprises Group, Inc.* (1993) 14 Cal.App.4th 477, 485.)  The superior court's factual findings regarding whether the Board established good cause to intrude on the patients' privacy rights are reviewed under the substantial evidence standard.  (*Fett, supra*, 245 Cal.App.4th at p. 216.)

## III.    Privacy Law in California

The state Constitution expressly grants Californians a right of privacy, which extends to their medical records. (Cal. Const., art. I, § 1.)  As one court put it:  "The state of a person's gastro-intestinal tract is as much entitled to privacy from unauthorized public or bureaucratic snooping as is that person's bank account, the contents of his library or his membership in the NAACP."  (*Board of Medical Quality Assurance v. Gherardini* (1979) 93 Cal.App.3d 669, 679 (*Gherardini*).)

In *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35 (*Hill*), the California Supreme Court established a framework for evaluating potential invasions of privacy. The party asserting a privacy right must establish a legally

10

protected privacy interest, an objectively reasonable expectation of privacy in the given circumstances, and a threatened intrusion that is serious.  (*Id.* at pp. 35–37.)  The party seeking information may raise in response whatever legitimate and important countervailing interests disclosure serves, while the party seeking protection may identify feasible alternatives that serve the same interests or protective measures that would diminish the loss of privacy.  A court must then balance these competing considerations.  (*Id.* at pp. 37–40.)

Additionally, good cause is required to be shown when the state seeks to invade an individual's privacy rights through an administrative subpoena seeking his or her medical records.  (*Gherardini, supra*, 93 Cal.App.3d at p. 681; *Wood v. Superior Court* (1985) 166 Cal.App.3d 1138, 1141–1143 (*Wood*).)[2]  Good cause " 'calls for a factual exposition of a reasonable ground for the sought order.' "  (*Gherardini, supra,* at p. 681 quoting *Waters v. Superior Court* (1962) 58 Cal.2d 885, 893.)

In *Wood,* the Board issued administrative subpoenas for the medical records of 52 patients under the care of two different physicians because it suspected the physicians were over-prescribing certain Schedule II drugs.  In support of the subpoenas, the Board submitted declarations from its investigators that stated they had obtained copies of the two

---

[2]    The Supreme Court disapproved *Wood* and *Gherardini* to the extent they hold that a compelling interest must always be shown when an individual's privacy rights are implicated, rather than employ a balancing analysis under *Hill*.  (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 556–557, fn. 8.)  Because the high court did not overrule *Wood* and *Gherardini* on any other ground, we continue to rely on these cases for their good cause analysis and for other propositions.

11

doctors' Schedule II drug prescriptions from various pharmacies. One investigator reported a pharmacist had told her he believed a particular patient was receiving an excessive dose of Demerol. The Board's medical consultant opined that there existed a " 'definite possibility of excessive prescribing of controlled drug substances' " and that the medical records should be obtained to determine whether appropriate medical conditions existed to warrant the prescriptions. (*Wood, supra*, 166 Cal.App.3d at p. 1142.)

The court concluded the Board's showing was insufficient to warrant a demand for the complete medical records of the patients, because it included records of medical issues unrelated to the prescription of the controlled substances. (*Wood, supra,* 166 Cal.App.3d at p. 1149.) The court further stated, "Here we have some facts about the prescriptions and the conclusions of board personnel that they are suspicious but no mediating facts revealing why the conclusion is warranted. The board has made no evidentiary showing of how often physicians similarly-situated to petitioners might prescribe these drugs. Alternatively, the board has made no showing of the likelihood that the prescriptions could have been properly issued, given what is known of the circumstances of issuance. Absent this information the trial court has no means by which to gauge the likelihood that the records sought will reveal physician misconduct. Without this there can be no independent judicial assessment of good cause. The judicial function of assessing cause [citation] cannot be abdicated by deferring to the bare conclusions of board personnel." (*Id.* at p. 1150, italics omitted.)

In *Bearman v. Superior Court* (2004) 117 Cal.App.4th 463 (*Bearman*), a doctor prescribed marijuana to his patient to treat

migraines and attention deficit disorder.  The doctor provided the patient with a letter certifying the patient was under his medical care and, having evaluated the medical risks and benefits of cannabis use with the patient, the doctor approved his use of cannabis for the relief of pain and nausea of migraines and decreasing the frequency and intensity.  The doctor further stated the approval for medicinal cannabis would not require a repeat visit until November or December 2001, effectively providing an expiration date for the prescription.  (*Id.* at p. 467.)

On April 10, 2001, park rangers discovered pipes and marijuana among the patient's possessions.  The patient presented the letter to the rangers.  Believing the doctor was possibly violating the law and medical ethics by exceeding his scope of practice, one of the park rangers sent a copy of the letter to the Board and asked for " 'appropriate actions.' " (*Bearman, supra,* at pp. 467–468.)  An investigation was initiated and the Board issued an administrative subpoena for the patient's records after the patient refused to consent to the disclosure.  (*Id.* at p. 468.)

The trial court granted the Board's petition to compel compliance, but on appeal, the court found an absence of good cause for disclosure of the patient's records.  The court concluded the supporting declarations by the Board "are nothing more than speculations, unsupported suspicions, and conclusory statements drawn solely from [the doctor's] letter to [his patient] and the simple fact he recommended the use of marijuana." (*Bearman, supra,* at p. 471.)  There were no facts suggesting the doctor was negligent in his patient's treatment, or that he prescribed marijuana for improper reasons.  (*Ibid.*)

13

Similarly, in *Gherardini,* the investigator's declaration was insufficient because it "set[] forth no facts, no showing of relevance or materiality of the medical records of these five specified patients to the general charge of gross negligence and/or incompetence of the licensee-doctor." (*Gherardini, supra*, 93 Cal.App.3d at p. 681.)

By contrast, the court in *Cross v. Superior Court* (2017) 11 Cal.App.5th 305 (*Cross*) found good cause for an order compelling compliance with subpoenas for the medical records of three patients. There, the Board subpoenaed a psychiatrist's patient records to investigate an allegation that she improperly prescribed controlled substances to three people. (*Id.* at p. 310.) The psychiatrist refused to produce the records, invoking the psychotherapist-patient privilege and the patients' right to privacy. (*Ibid.*)

The Department of Consumer Affairs filed a petition to compel compliance with the subpoenas, which was granted. On appeal, the court concluded the patients had a state constitutional right to privacy that protects information contained in their medical records. (*Cross, supra,* 11 Cal.App.5th at p. 325.) Nevertheless, it found compelling the state's interest in investigating whether a doctor prescribed excessive or improper amounts of controlled substances. (*Id.* at p. 327.)

The court found unpersuasive the psychiatrist's contention that there was no compelling interest in her particular case because the facts and declarations relied upon by the Board did not justify its investigation. (*Cross, supra,* 11 Cal.App.5th at p. 328.) Specifically, the psychiatrist argued the Board's expert was not competent to demonstrate it had good cause to investigate her prescribing practices because the expert was an

14

internist rather than a specialist in psychiatry. The court found the trial court did not abuse its discretion to conclude the Board's expert was qualified to competently render an opinion on the subject. (*Id.* at p. 327.)

Good cause was shown where the Board's medical consultant "opined on the nature and properties of the drugs prescribed, their potential complications, and the precautions that should be taken by a physician who prescribes the medications." (*Cross, supra*, 11 Cal.App.5th at p. 327.) In particular, the Board's expert believed the three patients in question, all women who were likely postmenopausal, may be at increased risk for coronary artery disease complications, which could be exacerbated by use of the prescribed stimulants. (*Id.* at p. 315.) The psychiatrist also prescribed high doses of Adderall, a drug predominately used to treat attention deficit hyperactivity disorder (ADHD) and narcolepsy. The psychiatrist prescribed Adderall to one patient at a dosage level that was three times the maximum recommended dosage for treatment of ADHD and in excess of the recommended dosage for treatment of narcolepsy. (*Id.* at pp. 312–313.)

Good cause was further shown by the investigator's declaration that one of the purported patients denied she was ever treated by the psychiatrist. Additionally, the psychiatrist had been disciplined by the Texas Medical Board for improperly prescribing sleep medication to a close family member. (*Cross, supra*, 11 Cal.App.5th at p. 328.)

## IV. The Board Has Failed to Demonstrate Good Cause

Dr. Cohanshohet challenges the basis for the subpoenas, contending good cause is lacking to order compliance of the subpoenas. We agree the Board has failed to demonstrate good cause.

Applying the guidance provided by *Wood, Bearman,* and *Cross,* we conclude Dr. Naqvi's declaration is insufficient to show good cause to compel compliance of the subpoenas at issue. Good cause requires something more than the mere fact that a specialist in pain medication prescribed doses slightly greater than 100 MED to three patients and two others received prescriptions for drugs which, used in combination, resulted in increased sedative effects.

As in *Bearman,* there are no facts suggesting Dr. Cohanshohet was negligent in treating his patients or that he prescribed controlled substances without meeting the standard of care. Given that Dr. Cohanshohet is a pain management specialist who sometimes treats patients seeking active cancer treatment, palliative care, and end-of-life care, it is reasonable to assume at least some of his patients would require treatment for pain that would exceed the recommended dose. Indeed, there is no indication how many patients Dr. Cohanshohet treats in total and what percentage the five patients at issue comprise that total.

As in *Wood,* the Board has made no evidentiary showing of how often similarly-situated physicians who specialize in pain treatment might prescribe these drugs. Neither has the Board made any showing of the likelihood that the prescriptions could have been properly issued, given what is known of Dr. Cohanshohet's practice. Instead, Dr. Berger identified instances

16

where his prescribing patterns would have been appropriate. Specifically, Dr. Berger indicated that the CDC's prescribing recommendations, relied upon by Dr. Naqvi, do not apply in cases involving "active cancer treatment, palliative care, and end-of-life care." Dr. Naqvi failed to discuss these circumstances in his declaration.

This is in contrast to the supporting evidence in *Cross,* which provided much greater detail as to why the drugs prescribed posed a greater risk to the three patients identified as opposed to a patient who was not a postmenopausal woman. In addition, one of the patients in *Cross* received doses that equaled three times the maximum recommended dose. Another patient denied she had been treated by the psychiatrist and the psychiatrist had been previously disciplined by the Texas Medical Board for improper prescription practices. (*Cross, supra,* 11 Cal.App.5th at pp. 312–315.) *Cross* presented a much greater showing of good cause to compel compliance of the subpoenas.

The Attorney General contends the consumer complaint, "which alleged the exact concerns identified in Dr. Naqvi's declaration," provides the additional evidence necessary to constitute good cause. We are not persuaded an anonymous complaint which provides scant detail, particularly about who and when the prescriptions were written, constitutes substantial evidence of good cause. Indeed, we are skeptical the complaint bolsters Dr. Naqvi's suspicions, given that Dr. Naqvi was induced to look through the CURES report for improper prescriptions of opioids because of the complaint. Thus, it may be the case that Dr. Naqvi looked through the CURES report to justify the allegations in the anonymous complaint.

17

## DISPOSITION

The order to comply with the challenged subpoenas is reversed and the trial court is directed to issue a new order denying the petition.  Dr. Cohanshohet is awarded his costs on appeal.


                                        BIGELOW, P. J.

We concur:

          GRIMES, J.



          STRATTON, J.

18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DEAN GRAFILO, as Director, etc., | B285193 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS169143) |
| v. | |
| KAMYAR COHANSHOHET, | ORDER CERTIFYING PUBLICATION |
| Defendant and Appellant; | [No change in the judgment] |
| MEDICAL BOARD OF CALIFORNIA, | |
| Real Party in Interest and Respondent. | |

THE COURT:

    The opinion in the above entitled matter was filed on January 22, 2019, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

BIGELOW, P. J.        GRIMES, J.        STRATTON, J.