Filed 10/2/19; Certified for publication 10/29/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DEAN GRAFILO, as Director, etc., | B286912 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS171127) |
| v. | |
| EMIL SOORANI, | |
| Defendant and Appellant; | |
| KIMBERLY KIRCHMEYER, as Executive Director, etc., | |
| Real Party in Interest. | |

APPEAL from an order of the Superior Court of Los Angeles County. Daniel S. Murphy, Judge. Affirmed.

Fenton Law Group, Benjamin J. Fenton, Dennis E. Lee and Alexandra de Rivera, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Xavier Becerra, Attorney General, Gloria L. Castro, Assistant Attorney General, Judith T. Alvarado and Christina Sein Goot, Deputy Attorneys General, for Real Party in Interest.

———————————————

Dr. Emil Soorani appeals from an order compelling the production of his patients' medical records to the Medical Board of California (the Board).  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  The Board's Investigation

Dr. Soorani is a psychiatrist who has been licensed by the Board as a physician and surgeon since 1981.

After receiving "information that Dr. Soorani may be overprescribing controlled substances[,]" the Board initiated an investigation.  The Board obtained a Controlled Substance Utilization Review and Evaluation System (CURES)[1] report detailing Dr. Soorani's prescribing history between June 1, 2012,

———————————————

[1]    CURES "is California's prescription drug monitoring program.  By statute, every prescription of a Schedule II, III, or IV controlled substance must be logged in CURES, along with the patient's name, address, telephone number, gender, date of birth, drug name, quantity, number of refills, and information about the prescribing physician and pharmacy.  [Citation.]"  (*Lewis v. Superior Court* (2017) 3 Cal.5th 561, 565 (*Lewis*).)  The Board is authorized to access the CURES database (*id.* at p. 567), which is maintained by the California Department of Justice (*id.* at p. 566).

and June 16, 2015. Dr. Jill Klessig, the Board's medical consultant, reviewed the CURES report and identified six of Dr. Soorani's patients—T.M., L.R., A.S., M.J., R.B., and A.D. (collectively, the six patients)—who were prescribed controlled substances in large quantities or with "erratic patterns." In Dr. Klessig's opinion, obtaining and reviewing the medical records of the six patients were necessary to determine whether Dr. Soorani was excessively prescribing controlled substances in violation of the Medical Practice Act (Bus. & Prof. Code, § 2000 et seq.).

In April 2016, a Board investigator sent letters to the six patients requesting that they contact him to schedule an interview "concerning the care and treatment" they received from Dr. Soorani. A medical release form was enclosed that, if signed, would authorize Dr. Soorani to disclose all of their medical records to the Department of Consumer Affairs, Division of Investigation (DOI), Health Quality Investigation Unit.[2] Also enclosed was a "Notice to Medical Consumers" (capitalization omitted) explaining that patient records reviewed in connection with DOI investigations "are kept confidential and no information about the patient's care is disclosed to the general public . . . ." Although patient records could become part of the official record of a legal proceeding, "[e]ven then, efforts are made to protect the privacy and identity of the individual patients." The six patients were advised that, if they exercised their "right not to consent to the release[,]" DOI would "take the necessary

---

[2]  The Board is a unit of the Department of Consumer Affairs. (See Bus. & Prof. Code, § 2001, subd. (a).)

steps to subpoena the . . . records." The Board did not receive a signed authorization form from any of the six patients.

In September 2016, an investigator issued investigational subpoenas duces tecum (the subpoenas) commanding Dr. Soorani to produce the following for each of the six patients: "A certified copy of the documentation supporting your rationale for the prescriptions you wrote for the patient . . . between the dates [June 1, 2012] through [September 12, 2016], including the different medications, doses, and refills. Documentation includes treatment notes that support the differential diagnosis for the medications, the treatment plan and orders, and all follow up including reviews of vital signs, patient complaints of side effects of medications, laboratory tests to ensure drug efficacy and to rule out drug toxicity, and physical examinations." (Bolding omitted.) Each of the six patients was sent a copy of the subpoena seeking his or her records, as well as a notice advising of the right to object.

Approximately one week later, Dr. Soorani's attorney sent a letter to the Board's investigator stating that the doctor would not produce the medical records sought by the subpoenas without patient authorization and invoking the psychotherapist-patient privilege (Evid. Code, § 1010 et seq.) and the right to privacy under article I, section 1 of the California Constitution. Dr. Soorani's attorney enclosed letters from four of the six patients indicating that they did not authorize disclosure of their medical records.

## II. Petition to Compel Compliance with the Subpoenas

In October 2017, more than a year after the deadline to comply with the subpoenas had passed, the director of the Department of Consumer Affairs petitioned the trial court for an

4

order requiring Dr. Soorani to produce the subpoenaed medical records. (Gov. Code, §§ 11186, 11187.)

### A. *Dr. Klessig's declaration*

In support of the petition, the Board submitted a declaration from Dr. Klessig, in which she opined that good cause existed to believe that Dr. Soorani violated the Medical Practice Act and "was practicing medicine outside the standard of care when he prescribed narcotics, sedative agents and other controlled substances to patients in large amounts." Obtaining the medical records of the six patients was "[t]he only way to ascertain whether this is true . . . ." Dr. Klessig detailed the following prescribing irregularities regarding the six patients that she found in the CURES report.

### 1. **Patient T.M.**

According to Dr. Klessig, Dr. Soorani excessively and erratically prescribed multiple stimulant and sedative medications to T.M.

T.M. was prescribed Vyvanse, "an amphetamine-like stimulant" used to treat attention deficit hyperactivity disorder (ADHD). Although the maximum daily dose of Vyvanse is 60 to 70 milligrams, T.M. received 30, 60-milligram tablets, followed only 14 days later by another 30, 70-milligram tablets— effectively "twice the maximum safe dose." The next month, T.M. "switched to amphetamine salts," but several months later he was prescribed the maximum recommended doses of both Vyvanse and the amphetamine salts.

T.M. was also prescribed a "very large" two-milligram dose of clonazepam, a sedative used to treat panic disorders and seizures—problems that "can be worsened by amphetamine use."

5

He also received oxycodone and OxyContin—both "strong narcotics."

A few months later, T.M. was prescribed a transdermal fentanyl patch, "an extremely potent narcotic with a very high risk of unintentional death." This drug "is only indicated when other means of pain management have failed[.]" On the same day, he received another prescription for oxycodone, which "in combination with the clonazepam was unsafe."

A month later, T.M. received a fentanyl refill and a new prescription for Subsys, another form of fentanyl. Although the recommended starting dose of Subsys is 100 micrograms, T.M. was given a 600-microgram dose. Several months later, T.M. was given 30 doses of 1,200 micrograms. "At the maximum safe dose, . . . this should have lasted 7.5 days." Yet he was prescribed another 30 doses only two days later. In the following week, T.M. was given an additional 60 doses, followed by 120 doses the next week, and another 120 doses two weeks after that.

Dr. Soorani also prescribed T.M. a stimulant used to treat sleep disorders at the highest dose while the other stimulants he had previously been prescribed at high doses were continued. In addition, T.M. received prescriptions for depo-testosterone at an interval that suggested "either there was no medical need for it in the first place or he was not receiving appropriate supplementation."

In Dr. Klessig's opinion, "there was a high chance of a lethal outcome if" T.M. had taken the medications as prescribed to him.

### 2. **Patient L.R.**

Dr. Soorani allegedly prescribed L.R. "potentially dangerous combinations of medications[] . . . with unclear medical justification."

L.R. "received excessive amounts" of methylphenidate, a stimulant that could be sold on the street for a few dollars. She filled three prescriptions on the same day for a total of 210 pills. Although this amount should have lasted 70 days "at the maximum safe/recommended dose[,]" she filled the prescriptions for another 210 pills only 19 days later.

She was also given amphetamine salts and lorazepam, a sedative, with a high starting dose. Another sedative, clonazepam, was added while L.R. was "still being prescribed the lorazepam."

She also received 120 tablets of oxycodone at three times the usual starting dose even though there was no indication that a milder narcotic had been tried first. In addition to the oxycodone, Dr. Soorani eventually prescribed L.R. OxyContin. While the standard of care requires a slow withdrawal of narcotics, L.R.'s narcotic prescriptions stopped abruptly.

### 3. **Patient A.S.**

A.S. was prescribed frequent, large amounts of zolpidem, a sedative used for sleep. He received 30 tablets of the maximum daily recommended dose, but only 11 days later he filled another prescription for 30 tablets of a slightly higher dose. He received 30 more tablets 11 days later, followed by 30 more 11 days after that, and another 30, yet again, 11 days later. A.S. continued to refill the zolpidem as often as every eight days for an unspecified duration. He was also given a prescription for 100 tablets of

clonazepam, which "in combination with the very large doses of zolpidem could result in serious oversedation."

### 4. Patient M.J.

M.J. was prescribed the sedatives clonazepam and zolpidem, which if combined could result in oversedation. At age 63, he was "at a much higher risk of hidden coronary artery disease or vascular disease[,]" and therefore his use of any stimulant required caution. Instead, M.J. was given erratic amounts of amphetamines, with "dosage changes [that] were not done slowly or in a linear fashion."

### 5. Patient R.B.

R.B. was given large amounts of the narcotic Endocet, a combination of oxycodone and acetaminophen. Six days after receiving 50 Endocet tablets, he was given another 170 tablets. Twenty days later, R.B. received another 180 tablets. The result was "a daily dose of [acetaminophen] well in excess of that considered safe." R.B. was also prescribed oxycodone without acetaminophen, OxyContin, and fentanyl. If taken as prescribed, this combination of narcotics "would potentially result in a high risk of oversedation."

R.B. was also prescribed "testosterone in a very erratic pattern."

### 6. Patient A.D.

A.D. received numerous prescriptions for narcotics, including 180 oxycodone/acetaminophen tablets followed by another 170 tablets only 14 days later. In addition, she was given sedatives such as zolpidem, clonazepam, and diazepam. In a period of less than three months, A.D. received 240 tablets of the normal daily dose of zolpidem. The combined amount of

8

medication prescribed "put her at high risk for oversedation, respiratory sedation, and/or unintentional overdose."

**B.** *Dr. Soorani's opposition*

Dr. Soorani opposed the petition and offered several declarations in support of his position.

**1. <u>Dr. Soorani's declaration</u>**

Dr. Soorani provided details about his professional qualifications and areas of expertise. He has been "practicing pain medicine treating patients with grave psychiatric illness since 1982." With an expertise in psychopharmacology, he has "a thorough knowledge of every antidepressant on the market since 1989." In 1994, Dr. Soorani became an assistant clinical professor of psychiatry at the Geffen School of Medicine at UCLA, and has taught medical students interviewing techniques for diagnosis and treatment, as well as psychopharmacologic management. As a "speaker for numerous pharmaceutical companies," he has instructed other physicians on new medications, including Vyvanse, OxyContin, Ambien (zolpidem), Xanax (alprazolam), and Actiq (fentanyl citrate).

Dr. Soorani denied overprescribing medication to any patient, including the six patients identified by Dr. Klessig. He disputed Dr. Klessig's competency as an expert, stating that "[s]he does not appear to have the necessary expertise in psychopharmacology or psychiatry . . . ." Four of the six patients directed Dr. Soorani "to protect their private medical and psychiatric records from disclosure." The other two patients had not provided their consent to the disclosure.

**2. <u>Dr. O'Carroll's declaration</u>**

Dr. Soorani submitted the declaration of Dr. C. Philip O'Carroll, a physician triple board certified in internal medicine,

9

psychology and neurology, and pain management, who specializes in treating patients with chronic pain and psychiatric issues. He opined that Dr. Klessig's reported findings from the CURES report were insufficient to conclude that Dr. Soorani overprescribed "or engaged in any inappropriate treatment."

He explained that pain specialists "see the most complex and extreme pain disorders[,]" and that he had "on many occasions . . . prescribed doses of medication that are well outside the norm." "Without a thorough understanding of the clinical scenario," according to Dr. O'Carroll, "it is impossible to make a [judgment] regarding appropriate dosing."

He also found Dr. Klessig's qualifications as an expert lacking, stating that she did "not appear to have the minimal education, training and experience one would expect a physician opining on such matters to have." Because Dr. Klessig was not a pain specialist or psychiatrist, she would have "little insight into the complexity of the patients that [such doctors] confront on a daily basis." Dr. O'Carroll also disputed the accuracy of Dr. Klessig's statement regarding the effect of stimulants on seizures in ADHD patients.

### 3. Patient declarations

Dr. Soorani also provided declarations from three of the six patients, each strongly objecting to the disclosure of their medical records.

Patient M.J. described Dr. Soorani as "a thorough and conscientious doctor[,]" who explained the purpose, side effects, and alternatives to the medications he prescribed. M.J.'s primary care physician knew about the medications prescribed by Dr. Soorani and never expressed any concern. M.J. had "shared private information about [his] relationships, medical history,

10

thoughts and feelings" with Dr. Soorani that he wanted protected from disclosure. He believed that he knew who had provided the information to the Board that Dr. Soorani allegedly overprescribed medications. That person "tried to blackmail" the doctor and M.J.

Patient R.B. explained that he had been severely injured in a car accident when he was a teenager, which resulted in numerous surgeries. As a result, he "live[d] in constant and severe pain[.]" R.B.'s rheumatologist, dermatologist, endocrinologist, and orthopedist knew about the medications prescribed to him by Dr. Soorani and believed them to be "appropriate and necessary to treat [his] complex medical condition."

Patient A.D. suffered from degenerative disc disease and severe arthritis, causing her "excruciating pain[.]" She described Dr. Soorani as "the kindest, most gentle soul that [she had] ever met." He was "not just a man who pull[ed] his patients in the room and wr[ote] them prescriptions"; rather, he listened and tried to help patients better themselves. For example, Dr. Soorani had introduced A.D. to yoga. A.D.'s "life would be destroyed if [her] records became public"; she had just concluded a custody dispute with her ex-husband, and she was "terrified that he w[ould] misuse and mischaracterize" her medical information before the family court.

C. *The trial court's order*

The trial court granted the petition. While recognizing that the six patients "undoubtedly have a privacy interest in their medical records," the court found that disclosure was "clearly justifie[d]" because of the state's "compelling interest in ensuring that the medical care provided by physicians conforms to the

11

applicable standard of care." The court concluded that "[w]hile Dr. Klessig's declaration may not *prove* that a violation occurred, it [was] sufficient to establish a reason to suspect that a violation occurred." The court ordered Dr. Soorani to produce the subpoenaed records within 10 days.

This timely appeal followed.

## DISCUSSION

**I. When the Board Seeks Psychiatric Records, It Must Demonstrate a Compelling Interest to Overcome a Patient's Right to Privacy.**

Privacy is an inalienable right under the California Constitution. (Cal. Const., art. I, § 1; *Lewis*, *supra*, 3 Cal.5th at p. 569.) It is well established that the right to privacy extends to medical records (*Cross v. Superior Court* (2017) 11 Cal.App.5th 305, 325–326 (*Cross*)), which may contain "matters of great sensitivity going to the core of the concerns for the privacy of information about an individual." (*Wood v. Superior Court* (1985) 166 Cal.App.3d 1138, 1147 (*Wood*).)[3] The privacy interest in psychiatric records is particularly strong and, in some respects, entitled to more robust protection than other types of medical

---

[3]    The California Supreme Court disapproved *Wood*, *supra*, 166 Cal.App.3d 1138 and *Board of Medical Quality Assurance v. Gherardini* (1979) 93 Cal.App.3d 669 (*Gherardini*) to the extent that those cases "require a party seeking discovery of private information to *always* establish a compelling interest or compelling need[.]" (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 557 & fn. 8, italics added (*Williams*).) *Wood* and *Gherardini* were not overruled on any other ground, and we rely on them for other propositions. (*Grafilo v. Cohanshohet* (2019) 32 Cal.App.5th 428, 437, fn. 2 (*Cohanshohet*).)

12

records.  (See *In re Lifschutz* (1970) 2 Cal.3d 415, 421–422, 434–435, fn. 20; *Susan S. v. Israels* (1997) 55 Cal.App.4th 1290, 1298–1299.)

But the privacy right is not absolute and at times must yield to other important interests.  (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 37 (*Hill*); *People v. Stritzinger* (1983) 34 Cal.3d 505, 511.)  One such countervailing concern is "the State of California['s] . . . most legitimate interest in the quality of health and medical care received by its citizens[.]" (*Gherardini*, *supra*, 93 Cal.App.3d at p. 679.)  The Board is a primary instrument through which the state addresses that interest.  (See *Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 7–10 (*Arnett*).)

The Board "is charged with protecting the public through, among other things, issuing medical licenses and certificates, reviewing the quality of medical practice carried out by licensed physicians, and enforcing the disciplinary and criminal provisions of the Medical Practice Act[.]" (*Cross*, *supra*, 11 Cal.App.5th at p. 311; see also Bus. & Prof. Code, § 2004.)  The Board has broad investigative powers to accomplish its mandate, including the authority to issue investigative subpoenas.  (See Bus. & Prof. Code, § 2220; Gov. Code, §§ 11180, 11181; *Arnett*, *supra*, 14 Cal.4th at pp. 7–8.)  The Board may seek records of noncomplaining patients (*Wood*, *supra*, 166 Cal.App.3d at p. 1144), even when no formal charges have been filed against a physician (*Arnett*, *supra*, 14 Cal.4th at p. 8).

"The subpoenas must, however, be issued 'in a manner consistent with the California Constitution and the United States Constitution.' (Gov. Code, § 11184, subd. (a).)" (*Grafilo v. Wolfsohn* (2019) 33 Cal.App.5th 1024, 1033 (*Wolfsohn*).)  Thus,

13

"when information about a patient's medical record is sought, California's constitutional right to privacy places procedural and substantive limits on the [Board's] subpoena power." (*Ibid.*)

"If a party refuses to comply with the administrative subpoena, the Board may petition the superior court for an order compelling compliance. (Gov. Code, §§ 11186, 11187.)" (*Cohanshohet*, *supra*, 32 Cal.App.5th at p. 436.) Although not "every assertion of a privacy interest under article I, section 1 must be overcome by a 'compelling interest[]'" (*Hill*, *supra*, 7 Cal.4th at pp. 34–35; see also *Williams*, *supra*, 3 Cal.5th at p. 557), because of the highly sensitive nature of psychiatric records, when seeking judicial enforcement of an investigational subpoena, "a psychiatric patient's constitutional right to privacy requires the [Board] to demonstrate a subpoena for the patient's records is supported by a compelling interest and that the information demanded is '"relevant and material"' [citation] to the particular investigation being conducted." (*Cross*, *supra*, 11 Cal.App.5th at p. 317.)

## II.  The Board Made a Sufficient Factual Showing of Good Cause to Compel Compliance with the Subpoenas.

There is no question that the state has compelling interests "in ensuring that the medical care provided by Board certified doctors conforms to the standard of care" (*Fett v. Medical Bd. of California* (2016) 245 Cal.App.4th 211, 225 (*Fett*)) and in regulating the distribution of controlled substances (*Lewis*, *supra*, 3 Cal.5th at p. 574; *Cross*, *supra*, 11 Cal.App.5th at p. 317). Dr. Soorani does not contend otherwise.

Rather, he argues that the Board failed to make a sufficient factual showing of good cause to justify the invasion of his patients' privacy.  Specifically, according to Dr. Soorani, the

14

Board was required but failed to show the absence of less intrusive means to further the state's compelling interests; that Dr. Klessig was not qualified to offer her opinion on Dr. Soorani's prescribing practices; and that Dr. Klessig's declaration was speculative and lacked evidentiary support. We disagree with each of these contentions.

### A. *Standards of review and relevant law*

To obtain an order compelling Dr. Soorani's compliance with the subpoenas, the Board bore the burden of demonstrating "through competent evidence that the particular records it seeks are relevant and material to its inquiry sufficient for a trial court to independently make a finding of good cause . . . . [Citations.]" (*Bearman v. Superior Court* (2004) 117 Cal.App.4th 463, 469.)

"The question of whether the Board established good cause to intrude on the patients' privacy rights is reviewed under the substantial evidence standard. [Citation.] However, the overall question of whether a subpoena meets the constitutional standards for enforcement is a question of law. [Citation.]" (*Fett, supra*, 245 Cal.App.4th at p. 216.)

The abuse of discretion standard applies to the trial court's admission of evidence (*People v. Waidla* (2000) 22 Cal.4th 690, 717), including the determination of whether an expert is qualified to testify (*Fett, supra*, 245 Cal.App.4th at p. 222).

### B. *The Board established the absence of less intrusive alternatives.*

"[A] logical corollary of the compelling interest doctrine is the alternatives test. . . . If an alternative means of securing the compelling interest can be devised by which to avoid or minimize the conflict between the values protected by the constitution and the values found to be of compelling interest, that must be done.

15

[Citation.]  This results in a prohibition, among other things, of overbroad means of enforcement.  It requires that the state utilize the 'least intrusive' means to satisfy its interest. [Citation.]"  (*Wood*, *supra*, 166 Cal.App.3d at p. 1148.)

In *Cross*, the court concluded that although the requirement that the Board proceed in the least intrusive manner meant that it had to first "pursue voluntary means of obtaining the information sought before resorting to compulsory process," it did not "impose[] . . . a strict narrow tailoring requirement . . . ."  (*Cross*, *supra,* 11 Cal.App.5th at p. 329.) Rather, "information demanded by an administrative subpoena in a case like this must be '"relevant and material"' to the investigation being conducted.  [Citations.]"  (*Ibid.*)

Here, the subpoenas were only issued after the Board's medical consultant reviewed the CURES report, identified specific patients subject to irregular prescribing patterns, and opined that reviewing those patients' records was necessary to determine if the prescriptions were appropriately issued, *and* after the Board unsuccessfully sought the six patients' authorizations to access the records.  The subpoenas only sought information that was '"relevant and material"' (*Cross*, *supra*, 11 Cal.App.5th at p. 329) to the Board's investigation.  Instead of overbroad demands for all patient records, the scope of the subpoenas was reasonably limited to only those documents that supported Dr. Soorani's rationale for writing prescriptions to the six patients within the specific time period at issue.

Dr. Soorani argues that the Board failed to first employ the "wide array of investigative tools at its disposal[.]"  He faults the Board for not assessing the credibility of the source of the initial information it received that he was overprescribing controlled

16

substances and for not obtaining "complete CURES reports for each" of the six patients. Such inquiries—even if informative—would not have obviated the need to review the patients' medical records to determine whether the prescriptions flagged by Dr. Klessig were medically appropriate.

We conclude that the Board's efforts prior to issuing the subpoenas, combined with the limited scope of the requested information, satisfy the alternatives test.

**C. *The trial court did not abuse its discretion by admitting and relying upon Dr. Klessig's declaration.***

Dr. Soorani contends that, as an internist, Dr. Klessig was not qualified to opine on the standard of care applicable to a psychiatrist.

"The competency of an expert 'is in every case a relative one, i.e. relative to the topic about which the person is asked to make his statement.' [Citation.]" (*Huffman v. Lindquist* (1951) 37 Cal.2d 465, 476–477.) If an expert "exhibits knowledge of the subject" on which she opines, she need not be a specialist; a general practitioner may suffice. (*Evans v. Ohanesian* (1974) 39 Cal.App.3d 121, 128; accord *Fett, supra,* 245 Cal.App.4th at p. 222.)

Dr. Klessig is a Diplomate of the American Board of Internal Medicine and on the teaching staff of the UCLA medical school. As a medical consultant for the state, she reviewed "questionable medical and surgical practices of physicians and surgeons licensed by the" Board, which required her "to maintain familiarity with the standard of practice in the State of California."

Dr. Klessig appropriately testified "to matters within the knowledge and observation of every physician, whether or not . . .

17

a specialist.  [Citation.]"  (*Rash v. San Francisco* (1962) 200 Cal.App.2d 199, 206.)  While the fact that she is not a psychiatrist specializing in pain management may go to the weight of her testimony (*ibid.*; see also *Cross*, *supra*, 11 Cal.App.5th at p. 327), it does not render that testimony incompetent.  Possible side effects associated with particular drugs, as well as standard recommended doses, are within the general knowledge of every physician, particularly one who is on the teaching staff of a medical school and employed as a medical consultant by the state.  (See *Cross*, at p. 327 ["[T]he nature and properties of [Adderall and Vyvanse], their potential complications, and the precautions that should be taken by a physician who prescribes the medications[] . . . are all topics sufficiently within the training and experience of a physician with a specialty in internal medicine"].)  And, while a psychiatrist's expertise might be necessary to justify or condemn Dr. Soorani's unusual prescribing practices at a later stage of administrative proceedings, Dr. Klessig was competent to *identify* those unusual prescribing practices at this early juncture.

We find no abuse of the trial court's discretion in admitting and relying upon Dr. Klessig's expert declaration.

**D.  *Dr. Klessig's declaration provided the trial court with sufficient competent evidence of good cause.***

Dr. Klessig's detailed analysis of the CURES report, with its citations to specific prescribing irregularities, provided ample evidence to support the trial court's independent finding of good cause to enforce the subpoenas.  (See *Wood*, *supra*, 166 Cal.App.3d at p. 1150 [requiring the Board to present "sufficient factual justification to permit the trial court to

18

independently assess the substantiality of the likelihood of improper prescription practices"].)

Dr. Klessig recounted specific examples of patients receiving high doses and large quantities of drugs, some of which could have had dangerous, even fatal, interactions with other prescribed medications.  This was sufficient to show "the root facts upon which [the Board's] inference of improper prescribing [was] based . . . ."  (*Wood, supra*, 166 Cal.App.3d at p. 1150.)  As this threshold showing was satisfied by Dr. Klessig's declaration, it is immaterial that the Board did not present additional evidence of good cause.[4]

Dr. Soorani's expert, Dr. O'Carroll, did not testify that the prescriptions issued by Dr. Soorani were medically appropriate, nor did he contest that they were suspicious.  Rather, Dr. O'Carroll explained that "a judg[]ment regarding appropriate

---

[4]     Dr. Soorani cites *Cohanshohet, supra*, 32 Cal.App.5th 428, a recent case where the appellate court reversed an order compelling a doctor to produce patient medical records.  The *Cohanshohet* court found that the declaration of the Board's expert was insufficient to show good cause because it did not provide evidence of the total number of patients treated by the doctor, "how often similarly situated physicians who specialize in pain treatment might prescribe these drugs[,] . . . [and] the likelihood that the prescriptions could have been properly issued, given what is known of [the doctor's] practice."  (*Id.* at p. 440; accord *Wolfsohn, supra*, 33 Cal.App.5th at p. 1036.)  But "*Cohanshohet* d[id] not suggest . . . that the evidence absent in that case . . . must be present in other cases" to show good cause. (*Wolfsohn*, at p. 1036.)  Although Dr. Klessig's declaration also lacked this type of information, we find that it was not necessary to a showing of good cause in this case.

19

dosing" is only possible through a "thorough understanding of the clinical scenario[.]" This supports the Board's position that the medical records were necessary to its investigation.

To the extent that Dr. Soorani argues that, because the actual CURES report upon which Dr. Klessig relied was not introduced into evidence, her expert opinion lacked evidentiary support, we disagree. No abuse of discretion can be shown in allowing Dr. Klessig, as an expert, to "rely on and recite the CURES report data in explaining the basis for her opinion. [Citations.]" (*Cross*, *supra*, 11 Cal.App.5th at p. 328.) Dr. Soorani's reliance on *Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, 742–743 and *Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510 is misplaced because those cases considered the standard of evidence necessary to meet a defendant's burden in a motion for summary judgment. Here, the trial court correctly distinguished a special proceeding to enforce an administrative subpoena from a motion for summary judgment, observing that the Board was not required to prove misconduct.[5]

Moreover, given that the Board's burden was not to prove wrongdoing but to put forth sufficient evidence to support its "inference of improper prescribing" (*Wood*, *supra*, 166 Cal.App.3d at p. 1150), we find that disagreements with the accuracy of some of Dr. Klessig's statements—such as whether two milligrams of clonazepam is a very large dose—are immaterial when the evidence is viewed in its totality.

---

[5] Indeed, Dr. Klessig testified that the only way to determine whether Dr. Soorani was practicing outside the standard of care was to obtain his patients' medical records.

20

We therefore conclude that the petition to compel compliance with the subpoenas was properly granted.

## III.  Dr. Soorani's Motion for Judicial Notice Is Denied.

Dr. Soorani asks us to judicially notice printouts of webpages from the Prescribers' Digital Reference and the Mayo Clinic website, which provide drug summaries for clonazepam.

"It is a fundamental principle of appellate law that our review of the trial court's decision must be based on the evidence before the court at the time it rendered its decision.  [Citations.]" (*California School Bds. Assn. v. State of California* (2011) 192 Cal.App.4th 770, 803.)  Therefore, appellate courts "generally do not take judicial notice of evidence not presented to the trial court."  (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.)  Dr. Soorani has provided no persuasive reason for us to deviate from this general rule.  Nor has he offered any explanation for his failure to present this evidence to the trial court.  Furthermore, our analysis would not change even if we were to take judicial notice of the documents.

Accordingly, we deny the motion for judicial notice.

**DISPOSITION**

The order of the trial court is affirmed.  The Board is entitled to its costs on appeal.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT

Filed 10/29/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DEAN GRAFILO, as Director, etc.,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EMIL SOORANI,<br><br>    Defendant and Appellant;<br><br>KIMBERLY KIRCHMEYER,<br>as Executive Director, etc.,<br><br>    Real Party in Interest. | B286912<br><br>(Los Angeles County<br>Super. Ct. No.<br>BS171127)<br><br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION** |

THE COURT:*

    The opinion in the above-entitled matter filed on October 2, 2019, was not certified for publication in the Official Reports.

    For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

*ASHMANN-GERST, Acting P. J., CHAVEZ, J., HOFFSTADT, J.